**NONCONFIDENTIAL**
**No. 16-2713**

# In the United States Court of Appeals For the Federal Circuit

THE CHAMBERLAIN GROUP, INC.,
*Plaintiff – Appellee,*

v.

TECHTRONIC INDUSTRIES CO. LTD.,
ET TECHNOLOGY (WUXI) CO. LTD.,
*Defendants,*

TECHTRONIC INDUSTRIES NORTH AMERICA, INC.,
ONE WORLD TECHNOLOGIES, INC., OWT INDUSTRIES, INC.,
RYOBI TECHNOLOGIES, INC.,
*Defendants - Appellants.*

On Appeal from the United States District Court for the Northern District of Illinois, Eastern Division
Case No. 1:16-CV-06097, Hon. Harry D. Leinenweber

## CORRECTED BRIEF OF APPELLANTS

William R. Peterson
Nicholaus E. Floyd
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana St., Ste. 4000
Houston, TX 77005
(713) 890-5188
(713) 890-5001 (Fax)

Julie S. Goldemberg
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5095
(215) 963-5001 (Fax)

Jason C. White
Michael J. Abernathy
Sanjay K. Murthy
Nicholas A. Restauri
MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive, Ste. 500
Chicago, IL 60601
(312) 324-1000
(312) 324-1001 (Fax)

***Counsel for Appellants***

## CERTIFICATE OF INTEREST

Counsel for Defendants-Appellants certifies the following:

**1. The full name of each party represented by me is:**

Techtronic Industries North America, Inc., One World Technologies Inc., OWT Industries, Inc., and Ryobi Technologies, Inc.

**2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

N/A

**3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of each party represented by me are:**

None

**4. The name of all law firms and the partners or associates that appeared for each party now represented by me in the trial court or are expected to appear in this Court is:**

MORGAN, LEWIS & BOCKIUS LLP:
Jason C. White
Michael J. Abernathy
Sanjay K. Murthy
William R. Peterson
Julie S. Goldemberg
Nicholas A. Restauri
Nicholaus E. Floyd

By: */s/ Jason C. White*
Jason C. White
Michael J. Abernathy
Sanjay K. Murthy
Nicholas A. Restauri
MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive, Ste. 500
Chicago, IL 60601

William R. Peterson
Nicholaus E. Floyd
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana St., Ste. 4000
Houston, TX 77005

Julie S. Goldemberg
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103

# TABLE OF CONTENTS

**Page(s)**


Certificate of Interest ....................i

Table of Contents .................... ii

Statement of Confidentiality .................... iii

Table of Authorities .................... iii

Statement of Related Cases....................1

Statement of Jurisdiction....................2

Statement of the Issues....................3

Introduction....................4

Statement of the Case....................6

Summary of the Argument....................14

Argument....................17

I. The District Court Erred in Finding a Likelihood of Success on the Merits Because TTI Raised a Substantial Question of Invalidity. ....................18

A. Under the plain language of the claims, TTI raised a substantial question of anticipation. ....................19

1. The district court identified only one element not disclosed by Menard: the “self-aware” controller. ....................19

2. The district court erred by reading the “self-aware” controller limitation into the claims. ....................23

B. The district court erred in defining “self-aware.” ....................32

C. Under the district court’s “self-aware controller” construction, TTI raised substantial questions of anticipation and obviousness....................32

1. Menard discloses a “self-aware” controller. ....................33

2. Alternatively, under the district court’s claim construction, the asserted claims of the ’275 Patent are obvious. ....................37

II. The District Court Erred in Finding that Chamberlain Established Irreparable Harm....................42

A. The district court erred in finding irreparable harm from lost sales. ....................44

## TABLE OF CONTENTS
(continued)

**Page**


1. The district court failed to find a causal nexus between any lost sales and the allegedly infringing feature. ..... 44
2. The district court's finding of lost sales rests on speculation, not evidence. ..... 45
3. Any harm from lost sales could be compensated through monetary damages. ..... 46

B. The district court erred in finding irreparable harm from price erosion. ..... 47

III. The Preliminary Injunction Rests Solely on the '275 Patent, Not the '966 Patent. ..... 48

Conclusion & Prayer for Relief ..... 51

Addendum

Proof of Service

Certificate of Compliance


## STATEMENT OF CONFIDENTIALITY

Materials omitted from pages 7, 8, 45, Appx2-3, and Appx15-16 of the nonconfidential version of the Brief of Appellant were filed under seal or redacted below, pursuant to the joint proposed protective order filed with the district court on September 23, 2016 (Ex. A, ECF No. 108-1). This material consists of proprietary business information not available to the public, including the functionality of technology alleged to constitute trade secrets and financial/revenue information.

## TABLE OF AUTHORITIES

**Page(s)**

*Abbott Labs. v. Andrx Pharm., Inc.*,
452 F.3d 1331 (Fed. Cir. 2006) ....................17, 46

*Advanced Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000) ....................21

*AIA Eng'g Ltd. v. Magotteaux Intern. S/A*,
657 F.3d 1264 (Fed. Cir. 2011) ....................30

*Altana Pharma AG* v. *Teva Pharm. USA, Inc.*,
566 F.3d 999 (Fed. Cir. 2009) ....................17, 18

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ....................17, 18

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
809 F.3d 633 (Fed. Cir. 2015) ....................43, 44

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010) ....................18, 42

*Automated Merch. Sys., Inc. v. Crane Co.*,
357 F. App'x 297 (Fed. Cir. 2009) ....................46

*Callaway Golf Co. v. Acushnet Co.*,
576 F.3d 1331 (Fed. Cir. 2009) ....................27

*Chamberlain Group, Inc. v. Lear Corp.*,
516 F.3d 1331 (Fed. Cir. 2008) ....................31

*Deepsouth Packing Co. v. Laitram Corp.*,
406 U.S. 518 (1972)....................49

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)....................50

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
340 F.3d 1314 (Fed. Cir. 2003) ....................35

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Intamin Ltd. v. Magnetar Techs., Corp.*,
483 F.3d 1328 (Fed. Cir. 2007) ....................................................................25

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
995 F.2d 1566 (Fed. Cir. 1993) ....................................................................17

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC*,
431 F. App'x 884 (Fed. Cir. 2011) ...............................................................31

*KSR Intern. Co. v. Teleflex Inc.*,
550 U.S. 398 (2007).......................................................................................38

*Luminara Worldwide, LLC v. Liown Electronics Co. Ltd*.,
814 F.3d 1343 (Fed. Cir. 2016) ....................................................................30

*Mayo v. Lakeland Highlands Canning Co.*,
309 U.S. 310 (1940).......................................................................................12

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*,
357 F.3d 1319 (Fed. Cir. 2004) ..............................................................17, 18

*Nutrition 21 v. United States*,
930 F.2d 867 (Fed. Cir. 1991) ................................................................45, 46

*Pretty Punch Shoppettes, Inc. v. Hauk*,
844 F.2d 782 (Fed. Cir. 1988) ......................................................................45

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) ....................................................................24

*Ricoh Co., Ltd. v. Quanta Computer Inc.*,
550 F.3d 1325 (Fed. Cir. 2008) ....................................................................49

*SAS Inst., Inc. v. ComplementSoft, LLC*,
825 F.3d 1341 (Fed. Cir. 2016) ....................................................................23

*Schering Corp. v. Geneva Pharm., Inc.*,
339 F.3d 1373 (Fed. Cir. 2003) ..............................................................19, 21

## TABLE OF AUTHORITIES
(continued)

**Page**

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)....................49

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015)....................23

*Titanium Metals Corp. of Am. v. Banner*,
778 F.2d 775 (Fed. Cir. 1985)....................28

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016)....................26

*Warner Chilcott Labs. Ireland Ltd. v. Mylan Pharm. Inc.*,
451 F. App'x 935 (Fed. Cir. Dec. 12, 2011)....................37

*Wind Tower Trade Coal. v. United States*,
741 F.3d 89 (Fed. Cir. 2014)....................17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................17, 42

*In re Zweiman*,
25 F. App'x 937 (Fed. Cir. 2001)....................41

### STATUTES

28 U.S.C. § 1292(a)(1)....................2

28 U.S.C. § 1292(c)(1)....................2

28 U.S.C. § 1295(a)(1)....................2

28 U.S.C. § 1331....................2

28 U.S.C. § 2107(a)....................2

35 U.S.C. § 271....................2

35 U.S.C. § 271(a)....................48, 49

## TABLE OF AUTHORITIES
(continued)

**Page**

### RULES

Fed. R. App. P. 4(a)(1)(A) .......... 2

Fed. R. Civ. P. 52(a) .......... 12

## STATEMENT OF RELATED CASES

Undersigned counsel is unaware of any case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because this civil action alleges patent infringement under the patent statute, 35 U.S.C. § 271.

This Court has jurisdiction under 28 U.S.C. § 1292(c)(1) to hear this appeal of an order granting an injunction in a civil action arising under an Act of Congress relating to patents. 28 U.S.C. § 1292(a)(1); 28 U.S.C. § 1295(a)(1).

The district court entered an order granting a preliminary injunction on September 27, 2016. A timely notice of appeal was filed on September 27, 2016. 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

The ultimate issue is whether the district court erred in granting a preliminary injunction forbidding Appellants to sell their garage door opener, the Ryobi GD200. There are three independent grounds for vacating the injunction:

(1) Under their plain language, the claims are anticipated by prior art. Did the district court err by construing the claims to include an additional limitation?

(2) This additional limitation was disclosed in the prior art or, at a minimum, obvious. Even under the district court's construction of the claims, did Appellants raise a substantial question of anticipation or obviousness?

(3) Chamberlain's attempt to show irreparable harm consisted only of speculation about lost sales and lower prices. Did the district court err in finding that Appellee would suffer irreparable harm in the absence of a preliminary injunction?

## INTRODUCTION

The preliminary injunction at issue rests on a fundamental error of claim construction and speculative assumptions of irreparable harm. The error in claim construction provides the most straightforward ground for vacatur.

Under the plain language of the claims, there is no question that TTI raised a substantial question of invalidity. The district court rejected TTI's argument only after reading an additional limitation—that the claimed "controller" must be a "self-aware" controller—into the claims based on an erroneous application of claim differentiation and a flawed reading of the prosecution history. On claim differentiation, the district court ruled that independent Claim 1 could not cover something claimed by dependent Claim 2, when Claim 1 must cover everything encompassed by Claim 2. On prosecution history, Chamberlain distinguished the prior art on grounds unrelated to the "self-awareness" of the controller. With the claim construction corrected, Chamberlain has failed to show a substantial likelihood of success on the merits, and the injunction must be vacated.

Even under the district court's claim construction, TTI raised a substantial question of invalidity. Prior art disclosed a "self-aware" controller, and in any event, the use of a "self-aware" controller was obvious. Even if the district court properly read a new limitation onto the claims, Chamberlain still failed to demonstrate a substantial likelihood of success on the merits.

The injunction must also be vacated because the finding of irreparable harm rests on speculation, without any explanation why Chamberlain's alleged injuries, if any, would be "irreparable." No evidence of irreparable harm justifies the extraordinary remedy of a preliminary injunction.

## STATEMENT OF THE CASE

Appellants Techtronic Industries North America, Inc., One World Technologies Inc., OWT Industries, Inc., and Ryobi Technologies, Inc. (collectively, "TTI") manufacture and sell power tools and accessories under the brand name "Ryobi." Appx2210. These power tools have given TTI a well-deserved reputation for quality and innovation. Appx2209-2210. TTI's Ryobi products are sold exclusively through The Home Depot. Appx2212.

In 2014, The Home Depot asked TTI to develop a new product: a garage door opener. Appx2213. Dissatisfied with the slow pace of innovation in garage door openers, The Home Depot expected that TTI could use its expertise to deliver a much-needed "game-changer" to the market. *Id.*

The Home Depot was right. In May 2016, TTI unveiled the Ryobi GD200, a novel and innovative new garage door opener. Appx6459. One key feature of the Ryobi GD200 is its modular design. Appx2213. Consumers can choose from a variety of different "modules" for the garage door opener, depending on their individual needs. *Id.* Available modules include a Bluetooth speaker for listening to music, a cooling fan, a power cord extension, a laser parking assistance module, and a removable backup battery compatible with Ryobi One+ Tools. *Id.* The Ryobi GD200 offers unique features and unmatched flexibility. Appx2211.

The Ryobi GD200 also offers a feature common to many devices in today's world: it can be controlled by a smartphone. Appx6097. Just like doorbells, thermostats, and washing machines,[1] information about the Ryobi GD200 can be displayed on a smartphone, and it can receive commands from a smartphone. *Id.*

The response from The Home Depot and consumers was enthusiastic. Appx6477. According to The Home Depot, customers "love the modules." *Id.* Moreover, "Ryobi has a loyal group of customers that like not only the garage door opener but other products sold by Ryobi." *Id.*

***Chamberlain sues TTI for patent infringement***

The response from established garage door opener manufacturers was less positive. Appellee The Chamberlain Group, Inc. ("Chamberlain") has manufactured garage door openers for decades, and its share of the market has grown to nearly [redacted] Appx1487. Chamberlain sells its products at several stores, including Lowe's, Sears, Menard's, and The Home Depot. Appx6230, Appx6261.

An internal Chamberlain document compared the various features of the GD200 to Chamberlain's offering. Appx594, Appx6255. Chamberlain concluded that the advantages of TTI's product included: higher [redacted] additional [redacted] capabilities, [redacted], features that ease [redacted] and flexible [redacted]

[1]http://www.ring.com; http://www.nest.com; https://www.cnet.com/news/control-these-large-smart-appliances-with-your-iphone/.

[redacted] *Id.* Chamberlain's only advantage over the GD200 was its [redacted] *Id.*

On June 10, 2016, Chamberlain sued TTI for patent infringement in the Northern District of Illinois,[2] accusing the Ryobi GD200 of infringing Patent No. 7,224,275 (the "'275 Patent"), which discloses garage door openers that wirelessly transmit status information, and United States Patent No. 7,635,966 (the "'966 Patent"),[3] which discloses garage door openers with removable batteries. Appx1198, Appx1207.

Chamberlain asserted two claims of the '275 Patent for purposes of the preliminary injunction. Independent Claim 1 of the '275 Patent recites:

> 1. A movable barrier operator comprising:
>
> a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states;
>
> a movable barrier interface that is operably coupled to the controller;
>
> a wireless status condition data transmitter that is operably coupled to the controller, wherein the wireless status condition data transmitter transmits a status condition signal that:

[2] Chamberlain initially sued TTI on May 24, 2016, and alleged infringement of four patents. Shortly afterwards, Chamberlain dismissed that case and filed the instant complaint.

[3] The district court denied a preliminary injunction based on the '966 Patent. Appx17-18.

> corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating states; and
>
> comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator.

’275 Patent, Claim 1.

Claim 5 depends from Claim 1, reciting:

> 5. The movable barrier operator of claim 1 wherein the plurality of operating states includes at least one of:
>
> moving a movable barrier in a first direction;
> moving the movable barrier in a second direction;
> reversing movement of the movable barrier;
> halting movement of the movable barrier;
> detecting a likely presence of an obstacle to movement of the movable barrier;
> detecting a likely proximal presence of a human;
> receiving a wireless remote control signal;
> receiving a wireline remote control signal;
> receiving a learning mode initiation signal;
> a lighting status change;
> a vacation mode status change;
> detecting a likely proximal presence of a vehicle;
> detecting the identification of a proximal vehicle; and
> receiving an operating parameter alteration signal.

’275 Patent, Claim 5.

On the same day it filed the new complaint, Chamberlain filed a motion for a preliminary injunction, asking the district court to enjoin further sales of the Ryobi GD200. Appx1221.

***In response, TTI challenges the validity of the ’275 Patent***

TTI argued that prior art anticipated the asserted claims of the ’275 Patent. U.S. Patent Application Publication No. 2002/0183008 to Menard (“Menard”), entitled “Power Door Control and Sensor Module for a Wireless System” published on December 5, 2002, discloses each element of Claim 1 and Claim 5, including a controller having a plurality of operational status conditions. Appx2187-2191.

To avoid anticipation by Menard and other prior art, Chamberlain’s reply introduced a new limitation found nowhere in the claims. According to Chamberlain’s reply, the word “controller” in Claim 1 of the ’275 Patent requires a specific type of controller: a controller using a “‘self-aware processor’ approach.” Appx3093.

Chamberlain’s position in its reply brief was brand new. Chamberlain’s motion for a preliminary injunction—filed on June 10—said nothing about requiring a controller to be “self-aware.” To the contrary, Chamberlain disclaimed any need for construction: “[C]laim construction is not necessary, because the claim terms are written in plain, understandable language.” Appx1236.

When TTI responded to the motion for a preliminary injunction, on August 3, TTI relied on the “plain, understandable language” of the claim terms, which make no mention of a “self-aware” controller. *See id.*

TTI only learned of Chamberlain's "self-aware controller" theory on August 25—four days before the hearing—when Chamberlain filed its reply in support of the motion for a preliminary injunction. *See* Appx3091-3094.

Between August 29 and 31, the district court held an evidentiary hearing on the preliminary injunction. At the hearing, Chamberlain elaborated on the meaning of "self-aware."[4] Here is how Chamberlain's expert, Dr. Thomas Rhyne, explained the "self-aware controller" limitation: Any type of controller can have operational status conditions. Appx6124. The only difference between "self-aware" controllers and "non-self-aware" controllers is how the operational status conditions are determined. *Id.* A controller is "self-aware" if it "determines the operating status conditions without making reference to an external operating status sensor." Appx6123. "If [the controller] has operational status conditions that are determined based on external sensors, then it is not self-aware." Appx6124.

For example, consider a garage door that operates with a single button: "You push a button and it closes. When you push the same button, it opens."

[4] Even during the hearing, Chamberlain's claim construction was a moving target. When the hearing began, "self-aware" required the controller to be "knowledgeable or self-aware of its present operating state." Appx6060. By the end of the hearing, Dr. Rhyne decided that a "self-aware" controller could determine its state from external information (such as a pushbutton) but not from an external "sensor." Appx6551.

Appx6126. Dr. Rhyne characterized this as a "good example" of a "self-aware" controller with "an internally determined state." *Id*. The controller knows whether a button push should raise or lower the door because it "keeps up with the state of the door." *Id.* "It knows that the door is up. So when you push it, it says, I want to go down, or vice versa." *Id.*

In contrast, if "an external sensor . . . detected the fact that the doors [have] actually gone to the top limit," then the controller would not be "self-aware." Appx6125.

***The district court adopts the "self-aware" construction and grants a preliminary injunction***

On September 13, the district court issued a memorandum opinion announcing that it intended to enter a preliminary injunction. Appx18. The opinion was entered on September 22. Although Rule 52(a) required the district court to "find the facts specially and state its conclusions of law separately," Fed. R. Civ. P. 52(a), the memorandum opinion mingled factual and legal conclusions with no distinction between the two. *See also Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 316 (1940) ("It is of the highest importance to a proper review of the action of a court in granting or refusing a preliminary injunction that there should be fair compliance with Rule 52(a) of the Rules of Civil Procedure.").

On September 27, the district court entered an order granting the preliminary injunction, enjoining TTI from "making, using, selling, or offering to sell in the

United States or importing into the United States the Ryobi GD200 garage door opener in a configuration that infringes claims 1 and 5 of the ’275 Patent under the Court’s Memorandum Opinion or products that are not colorably different therefrom.” Appx20.

TTI immediately filed a notice of appeal. Appx6726. TTI also filed an emergency motion asking this Court to stay the preliminary injunction pending appeal, to provide an expedited briefing schedule for this appeal, and to grant expedited consideration of the motion.

Chamberlain filed a response on October 5. The motion for an emergency stay remains pending before this Court.

## SUMMARY OF THE ARGUMENT

The preliminary injunction rests on a glaring error of claim construction. The plain language of Claim 1 requires a "controller." Prior art disclosed the use of controllers, along with all of the other limitations of the claim. Chamberlain failed to establish a likelihood of success on the merits because the patent is vulnerable to a challenge to its validity.

The district court avoided this conclusion—and found that Chamberlain had shown a likelihood of success on the merits—only by reading the "self-aware controller" limitation into the claim. This construction has no support in the claim's plain language. The district court instead derived the limitation by misapplying the doctrine of claim differentiation and misreading the prosecution history. Neither rationale survives scrutiny.

The district court first reasoned that because dependent Claim 2 recites that the controller is coupled to external sensors, the controller in independent Claim 1 cannot use external sensors. This analysis is backwards. Independent Claim 1 is broader than dependent Claim 2 and must, necessarily, encompass dependent Claim 2's use of sensors.

Indeed, the district court's construction of "controller" renders a different dependent claim inoperable. Dependent Claim 5 recites that one of the states of a

controller can be "detecting" various objects. But "detecting" an object necessarily requires the controller to use sensors, which "self-aware controllers" do not.

The district court also noted that several pieces of prior art before the examiner used controllers with sensors. The district court reasoned that the use of a "self-aware" controller was the only way that the examiner could have distinguished the claims of the '275 Patent over the prior art.

But this analysis conflicts with the actual prosecution history. In response to this prior art rejection, Chamberlain did not identify the "self-awareness" of its controller as a distinguishing feature. Instead, Chamberlain relied on a different limitation—the "unique identifier"—to distinguish the claims from the prior art.

Neither claim differentiation nor the prosecution history supports departing from the plain language of the claims. The specification likewise lacks any clear disavowal. Under the proper construction of "controller," Menard discloses this element, and as the district court correctly found, Menard discloses all other elements of Claim 1, thereby anticipating the asserted claims.

Even under the district court's interpretation, TTI raised a substantial question of invalidity. Contrary to the district court's interpretation, Menard discloses the use of a "self-aware" controller, as Menard does not require sensors to wirelessly transmit information to the user. At a minimum, use of a "self-aware" controller with Menard was obvious to a person of ordinary skill in the art.

In addition, U.S. Patent No. 6,392,537 to Tazumi discloses all of the limitations of the asserted claims except for wireless transmission. But as this Court has previously recognized, substitution of wireless communications for wired communications was obvious in 2001—two years before the ’275 Patent’s alleged priority date.

Finally, the district court erred in its analysis of irreparable harm. The district court found lost sales based solely on speculation and never found the requisite causal nexus between these lost sales and the patented features. The district court also erred in finding evidence of price erosion where there is none. There is no reason that either harm would be irreparable.

The ’275 Patent is vulnerable to invalidity challenges, and there is no evidence of irreparable harm. Either ground, standing alone, requires the preliminary injunction to be vacated.

## ARGUMENT

"A preliminary injunction is a 'drastic and extraordinary remedy that is not to be routinely granted.'" *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004) (quoting *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993)). Preliminary injunctions are "never awarded as of right." *Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 95 (Fed. Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008)).

"[A] movant cannot be granted a preliminary injunction unless it establishes both . . . likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001); *accord Altana Pharma AG* v. *Teva Pharm. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009). Chamberlain established neither.[5]

This Court generally reviews a preliminary injunction for an abuse of discretion, but review is *de novo* where (as here) the decision "hinges on questions of law." *Nat'l Steel Car*, 357 F.3d at 1325; *see also Wind Tower Trade Coal*, 741 F.3d at 95 (an error of law is an abuse of discretion).

---

[5] Chamberlain was also required to establish "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. These elements turn on the district court's analysis of the merits. *See, e.g.*, *Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006) ("the public is best served by enforcing patents that are likely valid and infringed" but "the public interest is best served by denying [a] preliminary injunction" when a plaintiff "d[oes] not establish a likelihood of success on the merits").

## I. The District Court Erred in Finding a Likelihood of Success on the Merits Because TTI Raised a Substantial Question of Invalidity.

To demonstrate a likelihood of success on the merits, a patentee must show that: (1) the patentee will likely prove that the accused infringer infringes the asserted patent; and (2) the patentee's infringement claim will likely withstand the accused infringer's challenges to the validity and enforceability of the patent. *Nat'l Steel Car*, 357 F.3d at 1325.

A preliminary injunction "should not issue if an alleged infringer raises a substantial question regarding . . . validity, *i.e.*, the alleged infringer asserts an . . . invalidity defense that the patentee has not shown lacks substantial merit." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010) (citation omitted). The burden to raise a substantial question of invalidity at this stage is lower than the burden prove invalidity at trial. At the preliminary injunction stage, "**[v]ulnerability** is the issue." *Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1006 (Fed. Cir. 2009) (quoting *Amazon.com*, 239 F.3d at 1359) (emphasis added).

Under the plain language of the claims, prior art anticipates the '275 Patent. The district court disagreed only because it erroneously construed the claims to include an additional limitation, not found in the plain language of the claims. Under a correct claim construction, TTI raised a substantial question of invalidity.

But even under the district court's construction, TTI raised substantial questions of invalidity based on anticipation and obviousness. Prior art disclosed the "self-aware controller" limitation, and in any event, use of a "self-aware" controller was obvious. Thus, even under the district court's construction, Chamberlain failed to carry its burden to show a substantial likelihood of success on the merits, and the preliminary injunction must be vacated.

**A. Under the plain language of the claims, TTI raised a substantial question of anticipation.**

"A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). "[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent . . . ." *Id.*

**1. The district court identified only one element not disclosed by Menard: the "self-aware" controller.**

Menard, entitled "Power Door Control and Sensor Module for a Wireless System" and published on December 5, 2002, discloses each element of the asserted claims of the '275 Patent.

Like the '275 Patent, Menard concerns a "moveable barrier operator." *See* Appx1169 at ¶1 ("a wireless system for controller and monitoring a power door"). The "processor" of Menard corresponds to the "controller" in the '275 Patent.

Appx1170 at ¶23. Menard explains that its processor may be operably coupled to a moveable barrier interface. *Id.* ("Processor 120 may also include a driver circuit to provide an electrical signal at a level sufficient to operate the garage door opener."); Appx2256-2259.

Menard teaches that the processor's status condition may be defined "by a plurality of operating states" as is required in Claim 1 of the '275 Patent. For example, one status may be that "a garage door position sensor indicates that the door is in a raised position and an obstruction in the path of the garage door travel is detected." Appx1170 at ¶25; *see also* Appx2260-2261.

These operating states from Menard correspond to operating states disclosed in dependent Claim 5 of the '275 Patent, which include "halting movement of the movable barrier" and "detecting a likely presence of an obstacle to movement of the movable barrier." '275 Patent, Claim 5; *see also* Appx2262-2263. Menard thus discloses the limitation of Claim 5 that "the plurality of operating states includes at least" one of the listed states.

Menard includes a "wireless receiver and transmitter." Appx1170 at ¶26. The system transmits a status signal corresponding to "door position information," Appx1174 at ¶68, which may indicate "the position of the door or any other information relative to the garage or the door opener." Appx1172 at ¶50; Appx1174 at ¶66 ("transmit position information, or any other information");

Appx1170 at ¶11 ("Other information, such as temperature or light levels, may also be transmitted to the device").

Menard also discloses that the status signal may include "an identifier that is at least relatively unique." '275 Patent, Claim 1. In discussing short-range wireless protocols, Menard specifically incorporates by reference the Bluetooth "technical specification version 1.0" ("Bluetooth Specification"), Appx1171 at ¶41, which discloses an identifier that is unique to the device.[6] For example, the Bluetooth Specification teaches that "[e]ach Bluetooth transceiver is allocated a unique 48-bit Bluetooth device address." Appx204. This address, "which is unique for each user," is used to maintain security under the Bluetooth security protocol. Appx210; *see also* Appx2261-2262.

Menard thus "discloses each and every limitation of the claimed invention." *Schering*, 339 F.3d at 1377. For the Court's convenience, the following chart lists the elements of Claim 1 of the '275 Patent and an exemplary corresponding reference from Menard:

[6] Material not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if incorporated by reference into the document. *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).

| **Claim 1 of the ’275 Patent** | **Menard** |
|---|---|
| A movable barrier operator comprising: | “A system . . . which allows remote control and management of single or multiple door openers . . .” Appx1169 at ¶9; *see also* Appx1170 at ¶23; Appx2256-2257. |
| a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states; | The processor may “receiv[e] a predetermined signal,” such as “the door is in a raised position and an obstruction in the path of the garage door travel is detected.” Appx1170 at ¶25; *see also* Appx1171 at ¶30; Appx1173 at ¶61; Appx2256-2257. |
| a movable barrier interface that is operably coupled to the controller; | “Processor 120 may also include a driver circuit to provide an electrical signal at a level sufficient to operate the garage door opener.” Appx1170 at ¶23; *see also id.* at ¶21; Appx1173 at ¶61; Appx2258-2259. |
| a wireless status condition data transmitter that is operably coupled to the controller, | “[A] processor . . . coupled to . . . a wireless transceiver.” Appx1169 at ¶10; *see also* Appx1170 at ¶¶21, 26; Appx2259. |
| wherein the wireless status condition data transmitter transmits a status condition signal that:<br><br>corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating states; and | “Position information is transmitted to the device by a transceiver coupled to the processor. Other information, such as temperature or light levels, may also be transmitted to the device.” Appx1170 at ¶11; *see also id.* at ¶25; Appx1171 at ¶30; Appx1172 at ¶50; Appx1174 at ¶¶66,68, 69; Appx2259-2261. |
| comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator. | Menard incorporates by reference “Bluetooth® technical specification version 1.0.” Appx1171 at ¶41. “Each Bluetooth transceiver is allocated a unique 48-bit Bluetooth device address (BD_ADDR).” Appx204; *see also* Appx2261-2262. |

Under the plain language of the claims, there is a substantial question of invalidity, as Menard anticipates the asserted claims of ’275 Patent.

**2. The district court erred by reading the “self-aware” controller limitation into the claims.**

The district court rejected TTI’s argument that Menard anticipates the asserted claims of the ’275 Patent for only one reason: according to the district court, Menard did not teach the use of a “self-aware” controller, which operates without external sensors. The district court explained that in Menard, “the controller relied upon external sensors in order to receive the information to be transmitted wirelessly.” Appx10. “Because none of the prior art . . . taught the concept of the ‘self-aware’ controller, TTI has not raised a ‘substantial question as to invalidity.’” *Id.*

This Court reviews the district court’s construction of the claims *de novo*, *SAS Inst., Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1347 (Fed. Cir. 2016), and reviews subsidiary factual findings underlying the claim construction for clear error. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

**a. The plain language of Claim 1 does not support the district court’s construction.**

By its plain language, Claim 1 is not limited to a “self-aware” controller. The claim language simply requires, “a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating

states." '275 Patent, Claim 1. The ordinary language controls: "controller" means "controller," not "self-aware controller." *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claim construction inquiry, therefore begins and ends in all cases with the actual words of the claim.").

The only limitation in the claim is that the controller must "hav[e] . . . operational status conditions." '275 Patent, Claim 1. Chamberlain's expert Dr. Rhyne admitted that "non-self-aware" controllers can have operational status conditions:

> Q. [T]he fact that the controller has operational status conditions does not make it self-aware; correct?
>
> A. That -- I agree with that. If it has operational status conditions that are determined based on external sensors, then it is not self-aware. It's not so much having the conditions, the status conditions, as where did it determine what the states were of those conditions.

Appx6124.

The specification of the '275 Patent does not support any departure from the plain meaning of the claim language. The specification describes both controllers that are "self-aware" and controllers that use sensors '275 Patent, 4:52-57 ("Depending upon the needs of the setting, the controller 11 **can be self-aware** of **such operational status conditions** . . . **or** the controller 11 **can be provided with externally developed information regarding the condition**.") (emphasis added); *see also* '275 Patent, 4:5-6 ("In a typical embodiment, the controller 11 will have a

plurality of operational status conditions.”). That is, either type of controller can be used, depending on the needs of the setting, and both types of controllers “hav[e] . . . operational status conditions,” as recited by Claim 1.

### b. The district court misunderstood the relationship of dependent and independent claims.

In departing from the ordinary meaning of the claim term “controller,” the district court appears to have relied on a mistaken form of claim differentiation, violating basic principles about how dependent claims work. The district court found that independent Claim 1 **could not** cover a controller that uses sensors as described in dependent Claim 2, when the opposite is true: independent Claim 1 **must** cover everything covered by dependent Claim 2. *E.g.*, *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1335 (Fed. Cir. 2007) (“An independent claim impliedly embraces more subject matter than its narrower dependent claim.”).

The district court began correctly, by noting that “dependent Claim 2 distinguishes itself from Claim 1 by adding to Claim 1, ‘a condition status sensor that is operably coupled to the controller.’” Appx8 (quoting ’275 Patent, Claim 2). But from here, the district court went astray, reasoning that “the only reasonable way to reconcile the difference between Claim 1 and Claim 2 is that Claim 1 eschews condition sensors in favor of a controller that does not rely on external sensors.” Appx8-9. That is, according to the district court, because Claim 2 has

sensors (like Menard), Claim 1 cannot have sensors. This Venn Diagram illustrates the district court's construction:




Indeed, under the district court's claim construction, dependent Claim 2 would paradoxically cover "self-aware" controllers (*i.e.*, controllers without sensors) with sensors.

The district court misunderstood the relationship of dependent and independent claims. Claim 2—a dependent claim—must be encompassed by independent Claim 1. Claim 1 cannot be construed to "eschew" the sensors used in Claim 2. This is black-letter patent law: "[C]onstruing the independent claim to exclude material covered by the dependent claim would be inconsistent." *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016).

Here is the correct Venn Diagram illustrating the relationship between Claim 1, an independent claim, and Claim 2, a dependent claim:




Independent Claim 1 necessarily includes both controllers that use sensors (as in dependent Claim 2) and controllers that do not (and are thus "self-aware").

The district court was led astray by Chamberlain, which characterized the independent claim and dependent claim as alternatives:

> The '275 patent's claim 1 recites the first scenario [of a self-aware controller] and the '275 patent's claim 2 corresponds to the second scenario [of a non-self-aware controller].

Appx3091. Indeed, Chamberlain recognized that dependent Claim 2 describes "the Menard approach" even while maintaining that Claim 1 is not anticipated by Menard. *Id.*

This Court has held such a position to be "irreconcilably inconsistent" because when a dependent claim is invalid due to prior art, the broader claim from which it depends must also be invalid. *Callaway Golf Co. v. Acushnet Co.,* 576

F.3d 1331, 1343 (Fed. Cir. 2009) ("A broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness.") (citation omitted). If "the Menard approach" anticipates dependent Claim 2, then it necessarily also anticipates independent Claim 1. *See Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 782 (Fed. Cir. 1985) ("It is also an elementary principle of patent law that when . . . a claim covers several compositions, the claim is 'anticipated' if one of them is in the prior art."). With a correct understanding of the relationship between dependent and independent claims, Menard anticipates Claim 1 and Claim 5 of the '275 Patent.

**c. The district court misread the prosecution history.**

The district court also misinterpreted the prosecution history of the '275 Patent. Two prior art references that were before the examiner disclosed controllers that relied on external sensors. Appx10. In concluding that the '275 Patent does not cover controllers that rely on external sensors, the district court reasoned that "the only way to distinguish the '275 patent from the prior art was for the examiner to conclude that the '275 patent does not rely on external sensors." Appx10.

The actual prosecution history belies the district court's conclusion. During prosecution, Chamberlain did not argue that the "self-aware controller" distinguished the invention from these references. Instead, Chamberlain amended

the claims to introduce a relatively-unique-identifier limitation and argued that this new feature distinguished the invention from the prior art. *See* Appx1178, Appx1190. This limitation—not the absence of external sensors—is what Chamberlain argued, and the examiner believed, distinguished the ’275 Patent from the prior art. The prosecution history does not support the “self-aware controller” limitation added by the district court.

**d. The district court’s construction renders dependent Claim 5 inoperable.**

Not only did the district court depart from the claim’s plain language without justification, but the district court’s construction also makes Claim 5, which depends from Claim 1, inoperable. Claim 5 requires that “the plurality of operating states includes at least one of” various states, including detecting objects such as a vehicle, a human, or an obstacle. ’275 Patent, Claim 5. But these objects can only be detected using external sensors, so Claim 1 cannot be construed to exclude embodiments with external sensors.

Chamberlain’s expert, Dr. Rhyne, admitted as much during the injunction hearing: “Q. So you would agree that the only way to detect the likely proximal presence of a vehicle [as recited in claim 5] is to use a sensor; correct? A. That’s the only way I know how to do it.” Appx6131.

The district court recognized that under its construction, portions of Claim 5 are inoperable: “[T]he author appeared to . . . claim such states which **might**

**through future invention** be able to be sensed by the controller without external sensors." Appx9 (emphasis added). That is, under present technology, Claim 5 is inoperable. *Cf. AIA Eng'g Ltd. v. Magotteaux Intern. S/A*, 657 F.3d 1264, 1278 (Fed. Cir. 2011) (rejecting an interpretation that "requires a material that . . . is physically impossible to produce"). "[A] construction that renders the claimed invention inoperable should be viewed with extreme skepticism." *Id.* at 1278.

Dependent Claim 5 provides further reason to reject the district court's construction of "controller" in favor of the plain meaning.

#### e. This Court should correct the claim construction error and vacate the injunction.

This Court recently reversed a district court for committing precisely the same error as the district court in this case: granting a preliminary injunction based on a construction that departed from the plain and ordinary meaning of the claims. In *Luminara Worldwide, LLC v. Liown Electronics Co. Ltd.*, the district court abused its discretion in granting a preliminary injunction after improperly importing a new limitation into a claim term. 814 F.3d 1343, 1353-54 (Fed. Cir. 2016). Just as the court below construed "controller" to require the additional limitation of "self-aware," the district court in *Luminara* construed "free to pivot" to require "movement that is more than rotation around two axes." *Id.* at 1352.

This Court rejected the district court's claim construction: "Absent lexicography or disavowal, we do not depart from the plain meaning of the

claims." *Id.* at 1353. "The standards for finding lexicography and disavowal are 'exacting.'" *Id.* This Court saw "no basis for departing from the plain meaning of the term 'free to pivot'" to include the two-axes limitation. *Id.* Similarly, there is no basis for departing from the plain meaning of "controller" in the '275 Patent.

In *Luminara*, this Court vacated the preliminary injunction because a substantial question of invalidity (based on anticipation) existed under the correct construction. *Id.* at 1354; *see also Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC*, 431 F. App'x 884, 892–93 (Fed. Cir. 2011) (vacating a preliminary injunction where the district court's failure to find a substantial question of invalidity was based on an incorrect claim construction).

This case presents the same situation as in *Luminara* and should end in the same result. The incorrect construction requires vacatur of the preliminary injunction: "[A] correct claim construction is almost always a prerequisite for imposition of a preliminary injunction[, and] . . . the district court's erroneous construction of the disputed terms requires this court to vacate the preliminary injunction." *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1340 (Fed. Cir. 2008) (reversing a preliminary injunction that was granted to Chamberlain based on an incorrect claim construction).

The district court erred in construing the claims to require a "self-aware" controller, which led to the failure to find that the '275 Patent was vulnerable to

invalidity challenges. Appx10. With this error of claim construction corrected, TTI has shown a substantial question of invalidity.

### B. The district court erred in defining "self-aware."

The district court further erred in defining "self-aware" to mean not reliant upon "external" sensors. Appx7. The "external" limitation also has no support in the specification or the claims. To the contrary, the specification teaches two types of controllers:[7] (1) a "self-aware" controller, and (2) a controller that is "provided with externally developed information" from "one or more status condition sensors." '275 Patent 4:56-59. These sensors can be "integral to the movable barrier operator." '275 Patent 4:60; *see also* '275 Patent, Figure 1 (showing a sensor internal to the controller). TTI strongly believes Claim 1 is not limited to a "self-aware" controller, but even if Claim 1 is limited to the "self-aware" controller embodiment, "self-aware" must mean "not reliant on sensors" instead of "not reliant on external sensors."

### C. Under the district court's "self-aware controller" construction, TTI raised substantial questions of anticipation and obviousness.

The Court need not even address the remaining arguments if it agrees with TTI that the district court erred in its claim construction. But even under the district court's construction, TTI raised substantial questions regarding the validity

---

[7] As detailed above, correctly construed, Claim 1 covers all types of controllers, regardless how they acquire their operational status conditions.

of the ’275 Patent. Menard discloses a “self-aware” controller, and, in any event, use of a “self-aware controller” is obvious.

### 1. Menard discloses a “self-aware” controller.

Menard does not require the use of external sensors to determine the controller’s operating states. For example, Menard’s Claim 27 does not require the use of sensors:

> 27. A method of operating a door comprising:
>
> establishing a wireless communication channel with a module coupled to the door;
>
> transmitting a position signal on the channel based on a position of the door;
>
> providing an indication to a user based on the position signal; and
>
> receiving an instruction signal on the channel, the instruction signal based on a user selected option for operating the door.

Appx1176. The specification confirms that using sensors is optional, not necessary:

> The method starts at item 355 and assumes that the user has a wireless device capable of communicating with transceiver 130. At 360, the user and system 100 establish a link on a communication channel. At 365, door position information is received by the user. **In one embodiment**, sensor 155 provides the position information to processor 120.

Appx1174 at ¶69 (emphasis added); *see also* Appx1168. If sensor 155 provides the position information “in one embodiment,” then there must be another

embodiment in which the sensor does not provide the position information to the processor.

Chamberlain's expert incorrectly characterized this portion of Menard during his testimony. Figure 8 of Menard includes the step (numbered 365) "receive door position." Appx1168. According to Dr. Rhyne, the phrase "receive the door position" means "that the controller doesn't generate the door position based on information it knows in and of itself but rather it receives it from one of these external sensors." Appx6523; Appx6524 ("[The controller] receives it and sends it out. . . . It comes in from an outside sensor."). That is, Dr. Rhyne thought that the door position is received **by the controller** from a sensor. But Menard explains that "receive door position" means that the "door position is received **by the user**" from the controller. Appx1174 at ¶69 (emphasis added). This misunderstanding thoroughly vitiates Dr. Rhyne's testimony that Menard relies on external sensors.

Indeed, Menard specifically discloses two internally determined states: (1) door position, and (2) power status. First, Menard discloses standard garage door openers that open and close the door with single button push: "[W]hen the button on switch 65 is pressed, power unit 15 drives door 40 to an open position if door 40 closed, and to a closed position if open." Appx1169 at ¶6.

Chamberlain's expert testified that such openers use a "self-aware" controller. The garage door's controller knows whether to go up or down when the user pushes the button "because the controller keeps up with the state of the door." Appx6126. Dr. Rhyne called this "a good example of an internally determined state," *i.e.*, a state determined without sensors. *Id.* Thus, one of ordinary skill in the art would recognize that Menard discloses both monitoring door position through external sensors and through a "self-aware" controller. *Cf. Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1325 n.6 (Fed. Cir. 2003) ("The anticipation analysis asks solely whether the prior art reference discloses and enables the claimed invention, and not how the prior art characterizes that disclosure or whether alternatives are also disclosed.").

Menard also discloses a power supply condition defined by a line power/battery power operating state. Appx1172 at ¶52. Menard explains that the processor may transmit a signal based on whether it is receiving line or battery power: "Battery power 127 allows the user to continue to wirelessly receive information regarding the position of the door regardless of the status of line power 128. **In one embodiment, transceiver 130 provides a wireless signal to the user to indicate that line power 128 has been restored**." *Id.* (emphasis added); *see also* Appx1165 at Fig. 5. Menard does not suggest that external sensors play any

role in determining whether line power has been restored, and Figure 2 connects the power directly to the controller.

Menard also discloses that the processor's memory could store information, such as "settings and configuration information" and "[d]ata for user-selected programming." *See* Appx1170 at ¶23 ("memory to . . . retain settings and configuration information"); Appx1173 at ¶59 ("[d]ata for user-selected programming may be stored in memory coupled to processor 120"). There is no question that Menard discloses that the processor could possess any number of operating states not determined by external sensors.

Menard also teaches that a wireless application protocol server may "allow a user to operate, program and monitor" the system. Appx1173 at ¶59; *see also id.* ("the user can remotely configure system 100"); Appx6370. Remote programming and configuration inherently disclose transmitting the current programming and configuration status—information that would be stored in memory, not read from external sensors. Moreover, the remote configuration disclosed by Menard directly corresponds to an operational state—"receiving an operating parameter alteration signal"—disclosed in Claim 5 of the '275 Patent.

Menard thus discloses the use of a "self-aware" controller and anticipates the asserted claims of the '275 Patent, even under the district court's incorrect construction. *See generally* Appx6370-6371.

**2. Alternatively, under the district court's claim construction, the asserted claims of the '275 Patent are obvious.**

Alternatively, as TTI argued to the district court, the asserted claims of the '275 Patent were obvious in light of the prior art. Appx6025. The opinion below does not address the obviousness of the asserted claims. The failure to make findings about this defense, alone, indicates that the preliminary injunction should be vacated. *See Warner Chilcott Labs. Ireland Ltd. v. Mylan Pharm. Inc.*, 451 F. App'x 935, 936 (Fed. Cir. Dec. 12, 2011) (vacating a preliminary injunction where, *inter alia*, the district court failed to make findings regarding the invalidity defense).

**a. The use of a "self-aware" controller with Menard is obvious.**

Even if Menard does not anticipate the use of a "self-aware" controller, the use of such a controller is obvious. As Menard and Chamberlain's expert, Dr. Rhyne, explain, the use of "self-aware" controllers has long been standard practice in garage door openers. *See* Appx6556 ("Q: You wrote a book in 1973 that talked all about self-aware controllers, correct? Dr. Rhyne: I did."). Any single-button controller is aware of the garage door's position. Appx6126.

Dr. Rhyne testified that the only difference between a "self-aware" controller and another controller is that a "self-aware" controller remembers the last command that it sent to a controlled device (such as opening the door or

turning on a light). Appx6125-6126. A “non-self-aware” controller uses an external sensor to verify that the command has actually been followed (such as using a camera to determine that the door has opened or that the light has turned on). *Id.*

Chamberlain does not suggest that the use of a “self-aware” controller yielded any unexpected results or benefits. *See* ’275 Patent, 3:49-50 (“Such controllers . . . are well understood in the art . . . ). To the extent that the district court is correct that the ’275 Patent avoided anticipation by combining Menard with a “self-aware” controller to achieve a predictable result, the asserted claims of the ’275 Patent are obvious. *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007) (“[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result.”).

**b. The use of a wireless transmitter with Tazumi was obvious.**

Moreover, the asserted claims of the ’275 Patent were obvious in light of combining a different piece of prior art with a wireless transmitter. U.S. Patent No. 6,392,537, entitled “Remote monitoring system for automatic door systems” to Soichi Tazumi et al. (“Tazumi”) discloses a “self-aware” controller of a garage door. Appx1154 at 1:63-65; Appx2263-2264.

Tazumi's Figure 5, reproduced below, shows examples of the data its control unit can transmit:

| Code Type | Content |
| --- | --- |
| ID Code | Identification of Door System |
| Failure Code | Identification of Failure |
| State Code | Operating State |

**FIG. 5**

Tazumi explains: "The state code contains information about the operating state of the automatic door when the detected failure occurs," including "maintenance information." Appx1158 at 9:7-15. Tazumi elaborates that the maintenance information "contains information as to [1] how many time the door has been opened and closed since the last maintenance, . . . [and 2] how many times the CPU 14 has been reset due to runaway of the CPU 14." *Id.* at 9:17-25. The maintenance information thus corresponds to an operational status condition that is defined by at least two operating states that are not determined by external sensors. *See* Appx6374-6375. Therefore, even under the district court's construction, Tazumi discloses the "self-aware" controller. *Id.*

The transmitted signal in Tazumi also includes an identifier that is at least relatively unique to the movable barrier operator, as Claim 1 requires:

> The failure information to be transmitted contains an ID code, a failure code and a state code, as shown in FIG. 5.

> The ID code is a code assigned to each of the door systems 2a, 2b and 2c to individually identify the door systems. The maintenance station 30 can determine the malfunctioning automatic door system from the received ID code.

Appx1157 at 8:63-9:2; *see also* Appx2268-2269.

The only element missing from Tazumi is wireless transmission, as Tazumi discloses a transmitter that utilizes a wired connection. Appx1157 at 7:13-16 ("The modem 38 is connected to a telephone set 40. The telephone 40 can communicate with a telephone set 44 at the maintenance station 30 via a public telephone line.").

But it would have been obvious for a person of ordinary skill in the art to modify Tazumi to utilize wireless transmissions, which were well known and disclosed in several prior art references from the same field that utilize similar technology prior to the '275 Patent's alleged May 29, 2003 priority date. *See* Appx2267, Appx2270-2276 (describing prior references from the garage door opener field disclosing wireless transmissions). Indeed, the '275 Patent's specification **admits** that wireless transmitters were well understood in the art at the time of the patent's filing. '275 Patent, 4:2-4

Menard discloses a wireless transmitter, Appx1169 at ¶¶1, 7, and Menard explains the benefits of wireless connections: "a controller having an unlimited geographical range." *Id.* at ¶8. A person of ordinary skill in the art would have

found it obvious to modify Tazumi to include a wireless transmitter in view of Menard. Appx2267.

In 2001—two years before the alleged priority date—this Court held that remote, wireless controls were obvious substitutes for wired controls. *See In re Zweiman*, 25 F. App'x 937, 939 (Fed. Cir. 2001) ("[O]ne skilled in the art would have been aware of the vast use of remote control means in situations where it is desirable to control operation of a device by wireless means."). This Court also remarked in 2001 that the use of wireless technology with garage door openers was well known. *See id.* ("Zweiman's specification cites eighteen prior art patents relating to remote control garage door openers"); *id.* (concluding that "[r]emote control garage door openers" are "reasonably pertinent" to the problem of controls of massaging devices).

The district court clearly erred in finding that "Tazuna [sic]" "relied upon external sensors in order to receive the information to be transmitted wirelessly." Appx10. First, it is undisputed that Tazumi does not transmit any information "wirelessly." Second, Dr. Rhyne never testified that information transmitted by Tazumi—"the number of times the CPU has been reset"—depended on an external sensor. Dr. Rhyne pled ignorance. *See* Appx6568 ("I don't know for sure how they detect it."); Appx6569 ("I don't know how that information is derived."). The only witness who understood Tazumi and testified about its meaning to a person of

ordinary skill in the art was Dr. Madisetti: "[Tazumi] doesn't rely on any sensors to provide operating param[eter] information and maintenance information, et cetera, for the movable barrier and its controller." Appx6375.

To defeat the preliminary injunction, TTI does not need to establish the invalidity of the '275 Patent. It is enough for TTI to raise substantial questions regarding its validity. *AstraZeneca LP*, 633 F.3d at 1050. Even under the district court's construction, in light of Menard and Tazumi, TTI has raised substantial questions of invalidity based on anticipation and obviousness.

Under a correct claim construction, Menard anticipates the '275 Patent. But, as discussed in this section, even under the district court's incorrect claim construction that adds the "self-aware" requirement, the '275 Patent is anticipated or obvious. Chamberlain has not shown that TTI's invalidity defenses lack substantial merit. The district court erred in finding that Chamberlain had a likelihood of success on the merits, and the preliminary injunction must be vacated.

## II. The District Court Erred in Finding that Chamberlain Established Irreparable Harm.

The district court also erred in analyzing irreparable harm. A preliminary injunction is "an extraordinary remedy" that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def.*

*Council, Inc.*, 555 U.S. 7, 22 (2008). Merely demonstrating "a possibility of irreparable harm" is insufficient. *Id.*

The district court found a risk that Chamberlain would suffer three types of injuries: loss of market share, profits, and price erosion. Although evidence established that Chamberlain's sales have increased since the introduction of TTI's product, the district court speculated—from "basic economic reasoning"—that Chamberlain would lose sales to TTI.

But critically, the district court failed to find any causal nexus between Chamberlain's (hypothetical) lost sales and the allegedly infringing feature. This, alone, vitiates its irreparable harm finding. Moreover, the district court provides no explanation why any lost sales (or market share or profits) would cause irreparable harm.

The finding of a risk of price erosion is equally flawed. No evidence established why The Home Depot lowered the price of Chamberlain's products, and uncontroverted evidence established that prices regularly fluctuate. Chamberlain failed to make the necessary "clear showing" would entitle it to the extraordinary remedy of a preliminary injunction.

### A. The district court erred in finding irreparable harm from lost sales.

#### 1. The district court failed to find a causal nexus between any lost sales and the allegedly infringing feature.

This Court requires a plaintiff seeking to show irreparable harm due to lost sales to "show a causal nexus between the infringement and the lost sales." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 641 (Fed. Cir. 2015). At a minimum, granting a preliminary injunction requires the district court to find "'some connection' between the patented features and the demand for the infringing products." *Id.*

The district court must also consider the degree to which other, unpatented features have contributed to the alleged lost sales. "[T]he fact that the infringing features are not the only cause of the lost sales may well lessen the weight of any alleged irreparable harm." *Id.* at 641-42.

The opinion below does not find a "causal nexus" between the patented features and any alleged lost sales. There is no finding "that the patented features impact consumers' decisions to purchase the accused devices." *Id.* at 642. And in this case, considering other causes of lost sales is particularly important, given Chamberlain's acknowledgement of the numerous ways in which TTI's product is superior to Chamberlain's. Appx5949, Appx6255; *see also* Appx6456-6458 (since there are lower price garage door openers available at The Home Depot with wifi

capability, "there must be other functionality and features that are driving consumers to purchase those products as opposed to a base product with wifi technology"); Appx6461 (Chamberlain's sales decreased the month before the Ryobi GD200 launched).

A preliminary injunction must be supported by "sufficient factual findings." *Pretty Punch Shoppettes, Inc. v. Hauk*, 844 F.2d 782, 784 (Fed. Cir. 1988); *see also Nutrition 21 v. United States*, 930 F.2d 867, 869 (Fed. Cir. 1991) ("Sufficient factual findings on the material issues are necessary to allow this court to have a basis for meaningful review."). With no factual finding of a causal nexus between the alleged infringement and lost sales, the preliminary injunction must be vacated.

**2. The district court's finding of lost sales rests on speculation, not evidence.**

Although the district court acknowledged that the uncontroverted evidence showed that Chamberlain's sales had "increased dramatically" and its sales price remained constant, the district court "suspected"—from alleged "basic economic reasoning"—that Chamberlain would lose sales to TTI. Appx15-16.

There is no evidence that Chamberlain has lost sales to TTI since TTI entered the market. To the contrary, Chamberlain's sales to Home Depot have **increased** by more than [redacted] since Chamberlain moved for injunctive relief. Appx2785; Appx2221; Appx2121 at 171 ("Since my declaration, [CGI's] unit sales at [The] Home Depot have increased on the HD950WF from the levels

reported here."); Appx6459 (stating that Chamberlain's data indicates that its sales have increased since TTI entered the garage door opener market). And, as of July 24, 2016, Chamberlain predicted that sales will increase in 2017. Appx2787; Appx2222. Chamberlain's actual and projected increased sales refute its arguments (and the district court's speculation) that it has lost market share due to TTI's market entry. Appx2222; *see also* Appx6464 (explaining that Chamberlain "hasn't showed that there's an actual reduction of market share" because "there is no data . . . to calculate Chamberlain's share of the market . . . .").

Under this Court's precedent, the district court's counterfactual speculation cannot support an injunction. *See Nutrition 21*, 930 F.2d at 871 ("[S]peculation that such losses [in market share] might occur [does not] amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial.").

**3. Any harm from lost sales could be compensated through monetary damages.**

The district court's opinion also fails to explain why any alleged lost sales would inflict irreparable harm. To the contrary, this Court has held that lost sales alone cannot demonstrate irreparable harm. *Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006); *see also Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009) ("Lost sales (without more) are presumed to be compensable through damages, so they do not require injunctive

relief."); *id.* (rejecting the argument that price erosion constitutes irreparable harm).

The opinion below never explains why these sales—unlike others—would cause irreparable harm. *See Nutrition 21*, 930 F.2d at 871 ("[T]he court's reliance on possible market share loss [as a basis for a preliminary injunction] would apply in every patent case where the patentee practices the invention."). And evidence in the record proves the contrary. *See* Appx6462-6463 (demonstrating how a court could compare projected and actual sales to determine "the exact quantity of units that represent a shortfall"). The district court's findings do not support a preliminary injunction.

**B. The district court erred in finding irreparable harm from price erosion.**

Nor is the district court's "price erosion" finding supported by the evidence. The district court noted that The Home Depot reduced the price it charges for one of Chamberlain's garage door openers,[8] Appx15, but the evidence established that The Home Depot's retail price for Chamberlain's products has regularly fluctuated. Appx6464. Chamberlain's witnesses agreed that "it's not unusual to see [retail]

[8] Neither TTI nor Chamberlain controls the price at which The Home Depot sells products. Appx2082 at 14-15.

prices go up and down." Appx6167. And Chamberlain presented no evidence establishing why The Home Depot reduced the retail price.

Moreover, Chamberlain's invoice price to The Home Depot has remained constant. Appx2121; Appx2222; *see also* Appx6464. Without evidence that Chamberlain is being paid less for its products, Chamberlain has not been harmed, much less irreparably harmed. Although Chamberlain did provide a rebate to The Home Depot for a short period in some markets after the introduction of the Ryobi GD200, Chamberlain is not currently funding any rebate. Appx4, Appx15-16. And Chamberlain offered a larger rebate to The Home Depot for a limited time in some markets in 2015, before TTI even entered the market. Appx6466-6467.

With no evidence that The Home Depot's price reduction was due to the TTI's competition, any finding that the temporary rebate was due to TTI's competition is also purely speculative.

## III. The Preliminary Injunction Rests Solely on the '275 Patent, Not the '966 Patent.

The district court's opinion and order confirm that the preliminary injunction rests entirely on the '275 Patent. Appx19; *see also* Appx18 ("The Court's decision relates to the finding that [Chamberlain] has carried its burden in requesting a preliminary injunction **only as to the '275 patent**."). For this reason, the '966 Patent is not the subject of this appeal.

Nonetheless, the district court's error in analyzing the '966 Patent is blatant, and guidance would be valuable. In seeking a preliminary injunction, Chamberlain attempted to demonstrate that TTI directly infringed the '966 Patent under § 271(a). Appx1235. But TTI cannot directly infringe the '966 Patent, which requires "a battery charging station in electrical communication with a rechargeable battery." '966 Patent, Claim 9. As the district court acknowledged, TTI "does not sell a battery with its [garage door opener]; the battery is sold separately." Appx11.

For reasons not entirely clear, the district court concluded that "the law suggests it is of little import whether TTI sells the backup battery in the actual box" with the battery charging station. Appx11. To the contrary, that TTI does not sell the patented device is crucial to the issue of direct infringement. *See* 35 U.S.C. § 271(a) (imposing liability on "whoever . . . sells any patented invention"); *see also Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 529 (1972) ("No wrong is done the patentee until the combination is formed. His monopoly does not cover the manufacture or sale of separate elements . . . associated to form the invention."). This Court should clarify this misunderstanding.

The district court speculated that selling the battery and charging station separately could constitute "contributory infringement." But this approach has at least two flaws. First, the district court never considered the other elements of

contributory infringement, such as whether TTI knew that its products were "especially made for use in connection with a particular patent," *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 440 (1984), whether TTI's products were "suitable for substantial noninfringing use," *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1337 (Fed. Cir. 2008), and whether TTI had both knowledge of the existence of the patent and knowledge that the component infringes, *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765, (2011). Second, Chamberlain's motion for a preliminary injunction never even mentioned contributory infringement.

Although the district court correctly denied an injunction based on the '966 Patent, this Court's guidance on the issue of direct infringement would be useful as the case proceeds on remand.

## CONCLUSION & PRAYER FOR RELIEF

To receive a preliminary injunction, Chamberlain was required to establish both a likelihood of success on the merits and irreparable harm. Chamberlain demonstrated neither.

The erroneous claim construction should be corrected, and the preliminary injunction should be vacated.

Dated: October 11, 2016

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Jason C. White*

Jason C. White
Michael J. Abernathy
Sanjay K. Murthy
Nicholas A. Restauri
77 W. Wacker Drive, Ste. 500
Chicago, IL 60601

William R. Peterson
Nicholaus E. Floyd
1000 Louisiana St., Ste. 4000
Houston, TX 77005

Julie S. Goldemberg
1701 Market Street
Philadelphia, PA 19103

***Counsel for Appellants, Techtronic Industries North America, Inc., One World Technologies Inc., OWT Industries, Inc., and Ryobi Technologies, Inc.***

# ADDENDUM

| **Document** | **Appx Page Nos.** |
|---|---|
| Memorandum Opinion and Order, Filed September 15, 2016 (ECF No. 107) | 1, 2-3, 4-14, 15-16, 17, 18 |
| Preliminary Injunction Order, Filed September 20, 2016 (ECF No. 111) | 19-20 |
| Patent No. US 7,224,275 B2, Dated May 29, 2007 | 41-49 |

77

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

THE CHAMBERLAIN GROUP, INC.,

Plaintiff,

v.

TECHTRONIC INDUSTRIES CO., LTD., TECHTRONIC INDUSTRIES NORTH AMERICA, INC., ONE WORLD TECHNOLOGIES, INC., OWT INDUSTRIES, INC., ET TECHNOLOGY (WUXI) CO. LTD., and RYOBI TECHNOLOGIES, INC.,

Defendants.

Case No. 16 C 6097

Judge Harry D. Leinenweber

REDACTED

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff Chamberlain Group, Inc.'s Motion for a Preliminary Injunction [ECF No. 8]. For the reasons stated herein, the Court grants the Motion.

## I. BACKGROUND

The Plaintiff, the Chamberlain Group, Inc. ("CGI"), based in Illinois, entered the Garage Door Opener ("GDO") market in 1958. Nine years later it introduced what was to become the market leading GDO, the Liftmaster. CGI has become well known for its development of safety measures and other innovative technologies and currently is the owner of approximately 350 patents. Currently GCI's Liftmaster is the number-one professionally installed GDO and its GDOs are present in a

majority of garages in America. CGI has approximately a [redacted] market share in the GDO market. It also is the leader in the sale of ancillary products.

In 2003, CGI filed an application for a patent entitled Movable Barrier Operators Status Condition Transception Apparatus and Method, which was granted in 2007 as Patent No. 7,224,275 (the "'275 patent"). The invention was described as "a moveable barrier operator [with] a wireless status condition data transmitter that wirelessly transmits status condition messages to one or more remote peripherals." The '275 patent was to become the basis for CGI's subsequent product called MyQ Technology. The MyQ technology allows the owner, using a CGI smartphone app, to monitor and control the status of the GDO remotely.

In 2006, CGI filed an application for a patent entitled Barrier Movement Operator Battery Backup and Power Equipment Battery Charging Center, which was granted in 2009 as Patent No. 7,635,966 (the "'966 patent"). The invention was described as a battery back-up for a barrier movement operator, which is capable of being used to power tools often stored in garages.

The Defendants, Techtronic Industries Co. Ltd., Techtronic Industries North America, Inc., One World Technologies, Inc., OWT Industries, Inc., Et Technology (Wuxi) Co. Ltd., and Ryobi Technologies, Inc. (collectively, "TTI") sell products under an

extensive portfolio of manufacturing brand names and also provide products for sale by third parties. TTI has considerable expertise in designing and selling power tools and accessories and owns a broad portfolio of intellectual property, including lithium-ion battery technology for portable, rechargeable batteries and battery charging stations. GDOs make up only a small portion of TTI's sales since it only recently extended into the GDO market.

In May of this year, TTI unveiled the Ryobi GDO, which it commenced selling through Home Depot's physical and on-line stores. CGI contends that the Ryobi GDO embodies the patented ideas expressed in its '275 and '966 parents. The Ryobi GDO includes a battery pack feature which is removable and can be used to power more than 70 Ryobi branded tools. The Ryobi GDO also includes a system for sending status updates wirelessly. When used in conjunction with the Ryobi smartphone app, the user is allowed to monitor and control the Ryobi GDO's status remotely, similar to CGI's MyQ system. At the time TTI introduced its Ryobi GDO, Home Depot was CGI's [redacted] customer and accounted for approximately [redacted] of CGI's retail GDO sales.

As a result of the introduction of the Ryobi GDO at Home Depot, CGI experienced an initial drop in sales for the two months succeeding the introduction. Since that time, Home Depot

reduced the price for the CGI GDO products which apparently caused a substantial increase in sales of CGI's products. Home Depot retains sole authority to set pricing. Home Depot initially funded the price decrease but then requested that CGI provide it with a rebate to absorb some of the price differential. CGI initially did so, but subsequent efforts between CGI and Home Depot to agree on a fixed rebate broke down so that CGI is not funding any price decrease decided upon by Home Depot. CGI publishes manufacturer's suggested pricing but has no authority to enforce any specific pricing with regard to Home Depot. There was no sales information available as to current sales of CGI's products at Home Depot subsequent to the week ending July 24, 2016.

## II. GENERAL RULES FOR PRELIMINARY INJUNCTION

CGI has filed this suit to enforce its intellectual property rights concerning, among others, the '275 and the '966 patents. They have now moved for a preliminary injunction to restrain TTI from selling its Ryobi GDOs and related products. To obtain a preliminary injunction the patent holder must establish four propositions: first, that it has a strong likelihood of success on the merits; second, that it is likely to suffer irreparable harm but for a preliminary injunction and therefore it has no adequate remedy at law; third, that equity heavily favors an injunction, *i.e.*, that the harm to the

plaintiff greatly outweighs the harm to defendant; and, fourth, that the public interest weighs in favor of a preliminary injunction. *See, Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1344 (Fed. Cir. 2008).

While at trial a defendant need prove invalidity by clear and convincing evidence, at the preliminary injunction stage the accused infringer need only show that there is a "substantial question as to the patent's invalidity or infringement." *LifeScan Scotland v. Shasta Techn.*, 734 F.3d 1361, 1366 (Fed. Cir. 2013).

Irreparable harm can assume a number of different forms, including lost market share, price erosion, lost goodwill and downstream sales. *See, Robert Bosch LLC v. Pyon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011). The mere possibility of irreparable harm is inconsistent with the characterization of injunctive relief as an extraordinary remedy and requires a "clear showing" that a plaintiff is entitled to relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

## III. <u>THE PATENTS IN SUIT</u>

### A. The '275 Patent

Claim 1: A moveable barrier operator comprising:
a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states;

a movable barrier interface that is operably coupled to the controller;
a wireless status condition data transmitter that is operably coupled to the controller, wherein the wireless status condition data transmitter transmits a status condition signal that:
corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating states; and comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator.

Claim 5: The movable barrier operator of claim 1 wherein the plurality of operating states includes at least one of:
moving a movable barrier in a first direction;
moving the movable barrier in a second direction;
reversing movement of the movable barrier;
halting movement of the movable barrier;
detecting a likely presence of an obstacle to movement of the movable barrier;
detecting a likely proximal presence of a human;
receiving a wireless remote control signal;
receiving a wireline remote control signal;
receiving a learning mode initiation signal;
a lighting status change;
a vacation mode status change;
detecting a likely proximal presence of a vehicle;
and receiving an operating parameter alteration signal.

**B. The '966 Patent**

Claim 9: A battery charging apparatus, comprising:
a battery charging station in electrical communication with a rechargeable battery and in electrical communication with a head unit of a barrier movement operator for supplying power to at least one rechargeable battery, the at least one rechargeable battery being removably connectable to electrically powered equipment other than and physically separate or separable from the barrier movement operator to provide power to the electrically powered equipment; and circuitry electrically connected to the battery charging station to supply power from the at least one rechargeable battery to the head unit.
Claim 14: The battery charging apparatus of claim 9, wherein the electrically powered equipment comprises a tool.

## IV. INFRINGEMENT OF THE '275 PATENT

TTI has a difficult task to demonstrate the lack of infringement by its Ryobi GDO since its technical expert, Dr. Madisetti, did not examine the Ryobi GDO. On the other hand, CGI's technical expert, Dr. Rhyne ("Rhyne"), purchased a Ryobi GDO and dismantled it and, with the assistance of CGI engineers, conducted extensive testing. Their testing included the use of WireShark protocol analyzer, which constitutes a method of capturing data as it is being transmitted by the Ryobi controller over WiFi link using the Ryobi router to a Media Access Control (MAC) address. From the results of the WireShark analysis, Rhyne was able to demonstrate the type of data transmitted and the addressee. Based on his examination and experience, Rhyne concluded that the Ryobi GDO met each of the elements of Claim 1 of the '275 patent. Rhyne explained that the crux of his infringement analysis revolved around the concept of the GDO controller being self-aware, *i.e.*, that it did not rely upon any external sensors to obtain the status conditions of the GDO, and which it was able to transmit upon request. Such status conditions include garage door open/shut, and garage lights on/off. According to his testimony, Rhyne's examination of the Ryobi GDO demonstrated to him that the GDO obtained and transmitted similar data without the aid of external sensors.

Rather than examine the Ryobi GDO and dispute Rhyne's findings, TTI's expert, Dr. Madisetti ("Madisetti", took issue with Rhyne's interpretation of some of the terms of Claim 1 of the '275 patent. In particular, Madisetti contended that Rhyne incorporated into his interpretation of Claim 1 the concept of a "self-aware" controller, which does not appear in the claim language. This is important because Madisetti argued that it is clear from the specific language of Claim 1, and reinforced by the language of dependent Claim 5, that the controller of Claim 1 is not totally self-aware, because many of the activities set forth in dependent Claim 5, such as detecting the presence of an obstacle, the proximal presence of a human, and the proximal presence of an vehicle must include the use of external sensors. Therefore self-awareness is not a limitation on the claim. This contention by Dr. Madisetti is more material to the issue of invalidity rather than the issue of infringement.

Rhyne responded to this criticism by pointing out that dependent Claim 2 distinguishes itself from Claim 1 by adding to Claim 1, "a condition status sensor that is operably coupled to the controller." Therefore the only reasonable way to reconcile the difference between Claim 1 and Claim 2 is that Claim 1 eschews condition sensors in favor of a controller that does not rely on external sensors. With respect to the list of

operational states that do appear to require external sensors, Rhyne responded that the author appeared to include such operational states so as to claim such states which might through future invention be able to be sensed by the controller without external sensors.

Based on the foregoing, the Court at this time finds that CGI has established a likelihood of success on the issue of infringement of Claim 1 of the '275 patent by the Ryobi GDO. As the Court has indicated, the crux of the issue is the '275 patent's description of a self-aware controller in Claim 1. Rhyne's testimony on this point was convincing, and Madisetti, who did not examine the Ryobi GDO, did not effectively rebut evidence that it piggybacked on the '275's description of a self-aware controller defined by a plurality of operating states.

## V. ALLEGED INVALIDITY OF THE '275 PATENT

TTI argues that without disagreement from CGI, that controllers, moveable barrier interfaces, and wireless transmitters were all well known in the art prior to the issuance of the '275 patent. Also, without disagreement from CGI, wireless transmitters, WiFi, the smart phone app, and smart phones are not covered by the patent in suit. TTI further argues that a number of prior references either include all of the limitations of the '275 claims or anticipated them.

Specifically, Dr. Madisetti relied on Menard, Tazuna and several other patents that described capabilities such as raising and lowering moveable barriers through the use of controllers that wirelessly transmitted various states of the moveable barriers. In response, Dr. Rhyne was able to show that in each reference, unlike with the '275 patent, the controller relied upon external sensors in order to receive the information to be transmitted wirelessly. Further, Rhyne was able to show that two prior art references, Morris and Chang, specifically involved communications between external sensors and the GDO controller, which then transmitted wirelessly the information so received from the sensors. Thus he argued the examiner clearly understood that the prior art covered the use of external sensors to communicate states or statuses to the controller and still approved the issuance of the '275 patent. In other words, the only way to distinguish the '275 patent from the prior art was for the examiner to conclude that the '275 patent does not rely on external sensors.

Because none of the prior art suggested by Dr. Madisetti taught the concept of the "self-aware" controller, TTI has not raised a "substantial question as to invalidity." *See*, *Amazon.com v. Barnesandnoble.com*, 239 F.3d 1343, 1359 (Fed. Cir. 2001).

## VI. WHETHER THE RYOBI GDO INFRINGES THE '966 PATENT

TTI's argument as to non-infringement of the '966 patent is two-fold. First, it points out that the Ryobi GDO does not sell a battery with its GDO; the battery is sold separately. Thus it argues that the Ryobi GDO does not include "at least one rechargeable battery." Second, TTI argues that Claim 9 does not provide for the use of the battery as a backup, but as an alternate source for powering the barrier movement operator.

First, the dispute as to Claim 9: CGI responds by showing that TTI's advertisements all focus on the fact that its GDO includes a battery recharge station and that there are available for sale batteries that can be recharged in the recharging station that can also be used to operate power tools. CGI also argues that while Claim 9 does not specifically state that the battery is a backup source, nevertheless the "summary of the invention at column 1, line 54 and 55 clearly state that the invention is directed to a system including a rechargeable battery backup." The "detailed description, column 3, lines 19-26 states 'a rechargeable battery backup is provided for use with a barrier movement operator.'" Furthermore, figure 6 to the '966 patent shows the method of utilization of the removable rechargeable battery, which clearly shows its role as a backup power source.

As to TTI's other argument, the law suggests it is of little import whether TTI sells the backup battery in the actual box with the Ryobi GDO. As CGI pointed out in closing arguments, TTI sells the battery alongside the system, and this coupled with the design of a rechargeable station integrated into the Ryobi GDO could constitute potential direct infringement, or at least contributory infringement. *See, e.g.*, *Ricoh Co. v. Quanta Computer Inc.*, 5505 F.3d 1325, 1337-39 (Fed. Cir. 2008). This is especially true given the evidence that TTI's advertising juxtaposed both the battery and the GDO together, and that at one time TTI gave new purchasers of a Ryobi GDO a free battery. In short, the facts above demonstrate a likelihood that TTI's Ryobi GDO also infringes Chamberlain's '966 patent.

## VII. ALLEGED INVALIDITY OF THE '966 PATENT

TTI further argues that the '966 patent was well known in the prior art, specifically citing the Peplinski and Weik patents. Peplinski describes the use of one or more batteries to provide backup power to the GDO in the event of an electric power outage. Weik provides two different scenarios regarding power sources or lack thereof. First, where a fire door is powered by AC and there is a power outage, the fire door is equipped with a socket which will allow a portable battery to be plugged into power the fire door. The battery is portable and

is brought to the scene by a service person. The second scenario is where the fire door does not have AC power and a battery is permanently installed to operate the fire door.

It seems clear that neither prior art reference standing alone covers the '966 patent. But Dr. Madisetti testified that a person having ordinary skill in the art would combine the two references, such that the Peplinski battery would be removable as described in Weik. This is essentially an argument that the combination was obvious.

In response, Dr. Rhyne argued that neither Peplinski nor Weik describe a removable battery that can be used to power other devices and that the situation they seek to remedy is not relevant to the '966 patent. To argue against obviousness, Rhyne pointed to one of TTI's own documents describing "new innovation opportunities" in which it outlined possible steps to expand its tool market. One of the ideas listed on the document was a removable GDO battery that would be compatible in certain Sears power tools. He took the document to be a form of praise of the concept behind the '966 patent.

A patent is not necessarily invalid simply because it was obvious "to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it." *In re*

*O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988). It may well be that the combination in question was obvious; this case is young and the record is not yet fully developed. Registered patents are presumed valid, and TTI has not raised a substantial question at this juncture as to the '966 patent's invalidity based on obviousness or any other argument.

## VIII. IRREPARABLE HARM

The Federal Circuit has held that irreparable harm requires a showing that, absent an injunction, the patentee is likely to suffer irreparable harm, and that a causal nexus exists relating the alleged harm to the alleged infringement. *See, Apple Inc. v. Samsung Electronics Co.*, 735 F.3d 1352, 1360 (Fed. Cir. 2013). The question is whether the allegations of harm are pertinent to the injunctive relief analysis or whether the patentee is merely seeking "to leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Apple Inc. v. Samsung Electronics Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). As was testified to by CGI's economic expert, Christopher Bakewell, the types of harm that can occur from infringement by a direct competitor are lost sales and market share, price erosion, and loss of future sales, customer relationships, referrals, and accessories.

The evidence produced at the hearing demonstrated that the Ryobi GDO is a direct competitor to the CGI GDO in the Home Depot market. They both are targeting customers who want "connected" GDOs, *i.e.,* those connected by the controller to smart phones through wireless transmissions. The evidence further showed that GDOs are relatively inelastic, since people normally are only in the market for GDOs if they are building a new home or garage or their existing GDO is in need of replacement. At the time of TTI's product launch in May, 2016, CGI had an approximate [redacted] market share of the GDO market. Genie had an approximate [redacted] of the market and "others" had the balance, approximately [redacted] Moreover, prior to the Ryobi launch, Home Depot accounted for approximately [redacted] of CGI's retail sales of GDOs.

While sales data of the Ryobi GDO were not available, the data did show a marked reduction in CGI sales immediately after the product launch. The evidence also showed that, after Home Depot made a significant unilateral reduction in price for CGI's signature unit, sales increased dramatically for the next 5 weeks. This fact alone suggests that the launch of the Ryobi GDO has caused price erosion. The evidence further showed that Home Depot has requested that CGI contribute to the cost of the price reduction through the form of rebates. CGI was willing to do so on a short-term basis, but negotiations for a more

permanent arrangement at this time had fallen through. The Court finds that there is clear evidence of price erosion caused by the Ryobi product launch.

While there is no clear evidence that there will be a reduction in CGI's market share, nevertheless basic economic reasoning dictates that it should be suspected. Assuming that the Ryobi introduction at Home Depot is successful (there is some circumstantial evidence that it is successful, such as preferential product location and advertising in Home Depot), there has to be some loss of market share on CGI's part. Since the product is relatively inelastic, a sale of a Ryobi GDO most likely comes at the expense of one of the other brands. Since CGI has almost [redacted] times the market share of Genie, one would expect that for every four Ryobi GDOs sold by Home Depot [redacted] would be lost by CGI and [redacted] by Genie.

The evidence also showed the sale of accessories are a very profitable part of the GDO market and that accessory sales accounted for approximately [redacted] of CGI's gross profit. Consequently, loss of market share of GDOs would have a substantial impact on the overall gross profit picture. There is a substantial risk of loss of market share, profits, and price erosion that would be directly connected to the entry of the TTI Ryobi GDO. The Court thus finds that CGI will suffer irreparable harm if a preliminary injunction is not granted.

The Court pauses for an important note: the above analysis regarding irreparable harm bears only on the Court's ultimate decision on CGI's '275 patent. That is because, as at least two witnesses noted at the hearing, CGI's GDOs currently do not practice the '966 patent relating to the removable backup battery. CGI has not sold commercially a GDO including the technology behind that patent. That necessarily means that the concerns regarding market share, price erosion, and lost profits have no applicability as to the '966 patent. CGI therefore has not proven irreparable harm based on infringement of the '966 patent.

## IX. THE BALANCE OF HARDSHIPS

The evidence showed that the GDO market is not significant from TTI's perspective. TTI has a multibillion dollar business of which GDOs constitute no more than one percent of its business. Prior to May of this year it had not sold a single GDO, and since the Court has agreed to hold the trial as early as February 2017, a delay of four months, while harmful, would not be critical to the health of TTI. On the other hand, GDOs are the core business of CGI and a loss would be much more serious to CGI than it would be to TTI. The Court therefore finds that balance of hardships favors CGI. Certainly if TTI is successful at trial, a judgment of money damages would redress any wrong an injunction might impose.

## X. THE PUBLIC INTEREST

While increased competition arguably is in the public interest, nevertheless protecting the interests of patent holders is also in the public interest because a strong, viable patent system inevitably leads to increased innovation. Here, as in *Apple Inc. v. Samsung Electronics Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015), an injunction would not keep some lifesaving drug off the market; rather it would make the marketing of GDOs more orderly and allow a final resolution of the issue of infringement and invalidity.

## XI. CONCLUSION

For the reasons stated herein, the Court grants CGI's Motion for a Preliminary Injunction [ECF No. 8]. The Court's decision relates to the finding that CGI has carried its burden in requesting a preliminary injunction only as to the '275 patent.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: SEP 15 2016

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE CHAMBERLAIN GROUP, INC.,<br><br>Plaintiff,<br>v.<br><br>TECHTRONIC INDUSTRIES CO. LTD., TECHTRONIC INDUSTRIES NORTH AMERICA, INC., ONE WORLD TECHNOLOGIES INC., OWT INDUSTRIES, INC., ET TECHNOLOGY (WUXI) CO. LTD., AND RYOBI TECHNOLOGIES, INC.<br><br>Defendants. | Civil Action No. 1:16-cv-06097<br><br>The Honorable Harry D. Leinenweber |

**PRELIMINARY INJUNCTION ORDER**

This patent infringement action is brought by plaintiff, The Chamberlain Group, Inc. ("CGI"), against defendants Techtronic Industries Co. Ltd.; Techtronic Industries North America, Inc.; One World Technologies Inc.; OWT Industries, Inc.; Et Technology (Wuxi) Co. Ltd.; and Ryobi Technologies, Inc., pursuant to 35 U.S.C. § 101 et seq. CGI asserts that defendants infringe two CGI patents: United States Patent Nos. 7,224,275 ("'275 Patent") and 7,635,966.

On June 10, 2016, CGI filed a motion and memorandum seeking a preliminary injunction. On August 2, 2016, Techtronic Industries North America, Inc.; One World Technologies Inc.; OWT Industries, Inc.; and Ryobi Technologies, Inc. filed a response. On August 24, 2016, CGI filed a reply. The parties presented witnesses and argument to the Court during an evidentiary hearing held August 29 to August 31, 2016.

Having considered the evidence, the Court GRANTS CGI's motion, in part, as to the '275 Patent. The Court has issued a Memorandum Opinion supporting this Order.

Therefore:

IT IS ORDERED that, pursuant to the Court's Memorandum Opinion and Federal Rule of Civil Procedure Rule 65, Techtronic Industries North America, Inc.; One World Technologies Inc.; OWT Industries, Inc.; and Ryobi Technologies, Inc., its officers, directors, agents, servants, representatives, employees, attorneys, and those persons in active concert or participation with Techtronic Industries North America, Inc.; One World Technologies Inc.; OWT Industries, Inc.; and Ryobi Technologies, Inc. and who receive actual notice of this Order by personal service or otherwise, shall be and hereby are enjoined and restrained from making, using, selling, or offering to sell in the United States or importing into the United States the Ryobi GD200 garage door opener in a configuration that infringes claims 1 and 5 of the '275 Patent under the Court's Memorandum Opinion or products that are not colorably different therefrom. The Court has approved CGI's bond in the amount of $7,500,000 to secure payment of any damages sustained by defendants if they are later found to have been wrongfully enjoined.

IT IS FURTHER ORDERED that this Order shall be and hereby is effective until further Order of the Court.

Dated: September 20, 2016

Honorable Harry D. Leinenweber

US007224275B2

(12) **United States Patent**
**Fitzgibbon**

(10) **Patent No.: US 7,224,275 B2**
(45) **Date of Patent: May 29, 2007**

(54) **MOVABLE BARRIER OPERATORS STATUS CONDITION TRANSCEPTION APPARATUS AND METHOD**

(75) Inventor: **James J. Fitzgibbon**, Batavia, IL (US)

(73) Assignee: **The Chamberlain Group, Inc.**, Elmhurst, IL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 162 days.

(21) Appl. No.: **10/447,663**

(22) Filed: **May 29, 2003**

(65) **Prior Publication Data**

US 2004/0239496 A1 Dec. 2, 2004

(51) **Int. Cl.**
***G08B 1/08*** (2006.01)
***G08C 19/00*** (2006.01)
***E05F 15/20*** (2006.01)

(52) **U.S. Cl.** ............................ **340/539.26**; 340/545.1; 340/539.1; 340/825.69; 340/825.72; 340/686.1; 49/25; 49/31

(58) **Field of Classification Search** ........... 340/825.69, 340/825.72, 539.26; 49/25, 31
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS



| | | | | |
|---|---|---|---|---|
| 3,611,333 | A | 10/1971 | Conigliaro | |
| 3,827,038 | A | 7/1974 | Willis | |
| 3,831,158 | A | 8/1974 | Rempel et al. | |
| 3,833,895 | A * | 9/1974 | Fecteau | 340/505 |
| 4,074,269 | A | 2/1978 | Hartley | |
| 4,090,182 | A | 5/1978 | Young | |
| 4,124,847 | A | 11/1978 | Cashman | |
| 4,464,651 | A * | 8/1984 | Duhame | 340/521 |
| 4,536,751 | A | 8/1985 | Shigemitsu et al. | |
| 4,583,081 | A | 4/1986 | Schmitz | |
| 4,750,118 | A | 6/1988 | Heitschel et al. | |
| 4,819,379 | A | 4/1989 | Kenzelmann et al. | |
| 4,868,543 | A | 9/1989 | Binkley | |
| 4,872,210 | A | 10/1989 | Benages | |
| 4,905,279 | A | 2/1990 | Nishio | |
| 4,954,810 | A | 9/1990 | Llewellyn | |
| 5,402,105 | A * | 3/1995 | Doyle et al. | 340/539.22 |
| 5,635,913 | A | 6/1997 | Willmott et al. | |
| 5,798,681 | A * | 8/1998 | Chang | 336/83 |
| 5,903,226 | A * | 5/1999 | Suman et al. | 340/825.69 |
| 6,025,785 | A | 2/2000 | Farris et al. | |
| 6,049,289 | A | 4/2000 | Waggamon et al. | |
| 6,070,361 | A | 6/2000 | Paterno | |
| 6,184,787 | B1 * | 2/2001 | Morris | 340/521 |
| 6,218,956 | B1 * | 4/2001 | Davis et al. | 340/5.2 |
| 6,346,889 | B1 | 2/2002 | Moss | |
| 6,597,291 | B2 * | 7/2003 | Tsui | 340/686.1 |
| 2002/0180600 | A1 * | 12/2002 | Kirkland et al. | 340/545.1 |
| 2003/0029579 | A1 | 2/2003 | Mays | |
| 2003/0076235 | A1 | 4/2003 | Tsui | |
| 2004/0212498 | A1 * | 10/2004 | Peterson et al. | 340/539.25 |

OTHER PUBLICATIONS

U.S. Appl. No. 10/226,854, filed Aug. 23, 2002, Doyle.
British Search Report for British patent application GB0412067.1 dated Oct. 4, 2004.

* cited by examiner

*Primary Examiner*—Donnie L. Crosland
(74) *Attorney, Agent, or Firm*—Fitch, Even, Tabin & Flannery

(57) **ABSTRACT**

A movable barrier operator (**10**) has a wireless status condition data transmitter (**15**) that wirelessly transmits status condition messages to one or more remote peripherals (**20**). The latter can in turn use this status information to effect their own functionality and supported features.

**31 Claims, 2 Drawing Sheets**






FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 5




FIG. 6

# MOVABLE BARRIER OPERATORS STATUS CONDITION TRANSCEPTION APPARATUS AND METHOD

## TECHNICAL FIELD

This invention relates generally to movable barrier operators.

## BACKGROUND

Movable barriers of various kinds are known in the art, including but not limited to horizontally and vertically sliding barriers, vertically and horizontally pivoting barriers, single-piece barriers, multi-piece or segmented barriers, partial barriers, complete barriers, rolling shutters, and various combinations and permutations of the above. Such barriers are typically used to control physical and/or visual access to or via an entryway (or exit) such as, for example, a doorway to a building or an entry point for a garage.

In many cases, a motor or other motion-imparting mechanism is utilized to effect selective movement of such a movable barrier. A movable barrier operator will then usually be utilized to permit control of the motion-imparting mechanism. In some cases a user may control the movable barrier operator by indicating a selection via one or more control surfaces that are physically associated with the movable barrier operator. In other cases such control can be effected by the transmission of a wireless remote control signal to the movable barrier operator.

Over time, the capabilities of and features supported by such movable barrier operators has expanded to include actions other than merely opening and closing a corresponding movable barrier. Some movable barrier operators provide ambient lighting. Some movable barrier operators can sense the likely presence of an obstacle in the path of the movable barrier and take an appropriate corresponding action. And some movable barriers have a plurality of operating modes to facilitate differing control strategies (for example, many movable barrier operators have a so-called vacation mode that prompts use of a differing set of operational states when the user leaves the movable barrier operator for an extended period of time or a learning mode that places the movable barrier operator into a programmable state to permit manual and/or automatic setting or selection of one or more operational parameters such as a maximum force setting).

Installation settings and needs can vary considerably from one place to another. Notwithstanding this truism, movable barrier operator manufacturers prefer to seek the economies of scale that attend the manufacture and distribution of movable barrier operator platforms that will provide satisfactory service in a wide variety of settings. As a result, some movable barrier operators are manufactured with the ability to support a wide range of functionality. Unfortunately, this often means that a physical interface must be provided to support numerous potentially utilized peripheral devices (including but not limited to sensors, control surfaces, alarms, displays, ambient and/or spot lighting, and so forth). This physical interface can represent undesired additional cost when part of the interface goes unused in a given installation.

Furthermore, even when a given installation includes use of all potentially supported peripherals, the physical installation itself will often necessarily include a physical signaling path to couple the movable barrier operator to the



various peripherals. This in turn can result in undesired exposed wiring and/or an undesired increase of installation time.

It is also likely in some installation settings that the physical interface of a given movable barrier operator, regardless of how well conceived in the first instance, may nevertheless fail to permit compatible support of a given peripheral. For example, a given user may wish to provide a quantity of individual lighting platforms that exceeds the number of lights that are supported by the physical interface for a given movable barrier operator. As another example, another given user may wish to support a relatively new function, such as an alarm that sounds when a possibly unauthorized individual enters an opened entryway, that is not specifically supported by a given movable barrier operator.

For these and other reasons, prior art movable barrier operators are often partially or wholly inadequate to suit the present and/or developing needs of a given application.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above needs are at least partially met through provision of the movable barrier operator status condition transmission apparatus and method described in the following detailed description, particularly when studied in conjunction with the drawings, wherein:

FIG. **1** comprises a block diagram as configured in accordance with various embodiments of the invention;

FIG. **2** comprises another block diagram as configured in accordance with various embodiments of the invention;

FIG. **3** comprises a flow diagram as configured in accordance with an embodiment of the invention;

FIG. **4** comprises a schematic view of a message packet as configured in accordance with various embodiments of the invention;

FIG. **5** comprises a flow diagram as configured in accordance with an embodiment of the invention; and

FIG. **6** comprises a block diagram as configured in accordance with an alternative embodiment of the invention.

Skilled artisans will appreciate that elements in the figures are illustrated for simplicity and clarity and have not necessarily been drawn to scale. For example, the dimensions of some of the elements in the figures may be exaggerated relative to other elements to help to improve understanding of various embodiments of the present invention. Also, common but well-understood elements that are useful or necessary in a commercially feasible embodiment are typically not depicted in order to facilitate a less obstructed view of these various embodiments of the present invention.

## DETAILED DESCRIPTION

Generally speaking, pursuant to these various embodiments, a movable barrier operator has a controller having a plurality of potential operational status conditions, a movable barrier interface that operably couples to the controller, and a wireless status condition data transmitter that is operably coupled to the controller as well. If desired, one or more status condition sensors can be utilized to sense one or more predetermined conditions and to provide corresponding indicia to the controller. In a preferred embodiment, the wireless status condition data transmitter transmits a status condition signal that corresponds to at least one of the potential operational status conditions. If desired, the status

condition signal can be combined with an identifier that correlates (uniquely or relatively uniquely) to the controller and/or the movable barrier operator. Such an identifier can serve to permit a receiving device to process as appropriate the status condition information.

Such status condition information can be received and processed, in a preferred embodiment, by a remote peripheral device (such as, but not limited to, a display, an alarm, a lighting control unit, and so forth). If desired, although the status condition information does not comprise a control signal as such (meaning that the status condition information does not comprise an instructional signal but rather presents only informational content), the remote peripheral can be configured to process the data content to thereby nevertheless effect a desired corresponding action.

So configured, a given movable barrier operator can be set to wirelessly transmit a wide variety of simple messages regarding its operational states. Such information can then be utilized to compatibly support a wide range of presently desired and later-developed features and functionality. If desired, the overall cost of a given platform can be reduced as the need to over-design a physical peripheral interface becomes diminished. Furthermore, such a platform has an improved opportunity to remain compatible with evolving features and legal and/or regulatory requirements to thereby promote a longer useful service life.

Referring now to the drawings, and in particular to FIG. **1**, in a preferred embodiment a movable barrier operator **10** will include a controller **11**, a movable barrier interface **12**, and a wireless status condition data transmitter **15**. The controller **11** will preferably comprise a programmable platform (such as, for example, a microprocessor, a microcontroller, a programmable logic or gate array, or the like) that can be readily programmed and configured in accordance with the various teachings set forth herein and as is generally well understood in the art. The movable barrier interface **12** couples to and is controlled by the controller **11** and further couples to a movable barrier **13**. Various mechanisms now known or hereafter developed can serve as the movable barrier interface **12** including various drive mechanisms, clutch arrangements, and so forth. In general, the movable barrier interface **12** serves to selectively impart motion to the movable barrier **13** to cause the movable barrier **13** to move to a desired position (such as, for example, a fully opened or a fully closed position) and/or to restrict or prohibit such motion (as when movement of the movable barrier may be the result of gravity and the movable barrier interface **12** serves in part to prevent such movement until such movement is desired). Such controllers **11** and movable barrier interfaces **12** are well understood in the art, and therefore, for the sake of brevity and the preservation of focus, additional explanatory detail regarding such mechanisms will not be provided here.

The wireless status condition data transmitter **15** operably couples to an output of the controller **11**. This transmitter **15** can be of any variety as may suit the needs of a given application. For example, the transmitter **15** can comprise a radio frequency carrier-based transmitter, an infrared carrier-based transmitter, or a sonic carrier-based transmitter (all being generally well understood in the art). In a similar fashion, the transmission power, modulation type, signaling protocol, and other attendant characterizing features and practices of the wireless transmitter **15** can again be as desired to suit the needs of a particular setting. In a preferred embodiment, this transmitter **15** will comprise a relatively low power transmitter such that the signals it broadcasts are only receivable within a relatively constrained area (such as, for example, an effective range of 100 meters, 500 meters, 1,000 meters, or the like). Again, such transmitters are well understood in the art and hence further elaboration here will not be provided.



In a typical embodiment, the controller **11** will have a plurality of potential operational status conditions. For example, the controller **11** might have two or more of the following potential operational status conditions:

- moving the movable barrier in a first direction (such as towards a closed position);
- moving the movable barrier in a second direction (such as towards an opened position);
- reversing movement of the movable barrier (for example, to alter movement from a closed position and towards an open position);
- halting movement of the movable barrier;
- detecting a likely presence of an obstacle (such as a person or pet) in the likely path of movement of the movable barrier;
- detecting a likely proximal presence of a human (such as a person in the vicinity of the controller);
- detecting a likely proximal presence of a compatible transmitter (such as a corresponding remote control transmitter for the movable barrier operator);
- receiving a wireless remote control signal (as sourced, for example, by a handheld remote control device);
- receiving a wireline remote control signal (as sourced, for example, by a wall mounted remote control device);
- receiving a learning mode initiation signal (via, for example, a switch provided for this purpose on the movable barrier operator housing);
- a lighting status change (as when, for example, the controller switches ambient lighting in a garage to an off condition a predetermined period of time following closure of the movable barrier);
- a vacation mode status change (as when a user effects this change via a switch provided for this purpose);
- detecting a likely proximal presence of a vehicle;
- detecting the identification of a proximal vehicle (as when, for example, the vehicle or some corresponding agent device transmits an identifying signal); and
- receiving an operating parameter alteration signal (via, for example, an integral or remote switch or other user interface).

It will be understood and appreciated that these are intended for illustrative purposes only, and that a given controller may have only a subset of these status conditions, a combination of some or all of these status conditions with other status conditions, or a set of wholly different potential status conditions.

Depending upon the needs of the setting, the controller **11** can be self-aware of such operational status conditions (as when, for example, the controller **11** is aware that it has switched a given ambient light fixture on or off) or the controller **11** can be provided with externally developed information regarding the condition. To effect the latter, it may be desirable in some settings to use one or more status condition sensors **14**. Such sensors **14** can be disposed integral to the movable barrier operator **10** as suggested by the illustration in FIG. **1** and/or can be configured as remotely disposed entities to suit the requirements of a specific application.

Pursuant to these various embodiments, the wireless status condition data transmitter **15** serves to transmit a status condition signal that represents a present operational status condition of the controller **11**. In a preferred embodi-

ment, this transmission occurs automatically in response to when the controller **11** detects at least one predetermined condition, which predetermined condition preferably, but not necessarily, corresponds to the present operational status being reported via the transmission. Another option would be to have such information transmitted on a substantially regular periodic basis. An illustrative (but not all-inclusive) listing of potentially useful predetermined conditions might include:

moving the movable barrier in a first direction;
moving the movable barrier in a second direction;
reversing movement of the movable barrier;
halting movement of the movable barrier;
detecting a likely presence of an obstacle to movement of the movable barrier;
detecting a likely proximal presence of a human;
receiving a wireless remote control signal;
receiving a wireline remote control signal;
receiving a learning mode initiation signal;
receiving an operating parameter alteration signal;
expiration of a predetermined duration of time; and
attainment of a predetermined point in time.

In a preferred approach, this status condition signal does not constitute a control signal per se. That is to say, the controller **11** does not necessarily source this status condition signal as a specific part of implementing a control strategy. As an example, the controller **11** would not source this status condition signal to specifically cause a light to be switched on upon receipt of the signal. Instead, the controller **11** sources this status condition signal to specify that it has, through some other means, initiated a control action or strategy to cause a light to be switched on. The status condition signal then simply reflects the actions being taken by the controller **11** and/or the other operational conditions being experienced by the controller **11**.

If desired, such status condition data signals can also be transmitted by the controller **11** via a wireline connection **16**.

Referring now to FIG. **2**, the status condition signals as transmitted from such a movable barrier operator **10** are preferably received by a remote peripheral **20** having a corresponding compatible wireless receiver **21** that operably couples to a peripheral controller **22**. The remote peripheral **20** itself can comprise any of a wide variety of platforms, including but certainly not limited to an informational display, a remote access interface, a light fixture, a timer apparatus, an alarm unit, and so forth. So configured, the remote peripheral **20**, upon receiving status condition information from the movable barrier operator **10** via the wireless transmissions being sourced by the latter, can process that information in accord with a desired end result. For example, the remote peripheral **20** can serve to simply further communicate such status information via a display such as an alphanumeric display, a graphic images display, one or more signal lights and/or corresponding indicative audible sounds, and so forth.

As another example, the remote peripheral **20** can process such status information to then itself ascertain a particular resultant course of activity. To illustrate, the remote peripheral can comprise a peripheral lighting unit that controls the provision of ambient lighting in a particular area (such as in a yard area outside the entrance to a residential garage). Upon receiving a status condition signal from the movable barrier operator **10** indicating that the movable barrier operator **10** has switched on its own lights, the remote peripheral **20** can then itself determine to also switch on its own lights. In a similar fashion, upon being informed that the movable barrier operator **10** has switched its lights off, the remote peripheral **20** can also decide to switch its own lights to an off condition.

So configured, it can be seen that when a movable barrier operator **11** provides wireless signals that represent one or more status conditions, a wide variety of known and hereafter developed remote peripherals **20** can be readily configured to leverage the receipt of such information for a variety of other purposes. Such remote peripherals can further supplement or extend the functionality of the movable barrier operator **10** itself (as when the remote peripheral **20** simply activates additional lighting to complement the lighting strategy of the movable barrier operator **10**) or they can facilitate functionality that is above and beyond the control architecture of the movable barrier operator **10**. To support the latter, it is preferred that the movable barrier operator **10** tend towards a relatively rich data stream where at least many or even substantially all current operational status conditions are regularly noted and transmitted to thereby provide considerable informational grist for use by the remote peripherals to thereby more likely facilitate additional not-otherwise-supported functionality.

Referring now to FIG. **3**, the movable barrier operator **10** related above serves as an appropriate platform to effect a process **30** wherein one or more predetermined operational status conditions are detected **31**. In a preferable approach, monitoring (and/or condition occurrence sensitivity) to support such detection occurs on a regular, or even substantially constant, basis. It is also preferred that a plurality of operational status conditions be monitored such that a plurality of differing operational status conditions can be so detected as they occur. As noted earlier, such monitoring and detection can result through one or more operational status condition sensors and/or through the ability of the controller to self-monitor its own operational status.

Upon detecting such a condition, the process **30** then forms **32** a message that includes content to relate, reflect, or otherwise correspond to the detected status condition. In an optional approach, this message can be formed to include an identifier for the movable barrier operator. For example, and referring now momentarily to FIG. **4**, such a message **40** can include a first field **41** that includes a specific identification number that is at least relatively unique to a given movable barrier operator and that also includes one or more additional data fields. A single data field can be used if desired to contain information that corresponds to the specified status condition. As another approach, and as illustrated, a plurality of fields (from field **1 41** to field N **43**) can be provided, with each field corresponding to, for example, a particular monitored condition. The content of such fields could then comprise one or more flags or other indicia to indicate a particular present status for each such field. (In another approach, such indicia could also provide an indication as to an anticipated or planned change to the status of a given condition including, where available, an anticipated or planned temporal schedule for effecting such changes.)

Upon receipt of such a message, a remote peripheral can use the identifying information to determine whether the received information corresponds to a relevant movable barrier operator (i.e., to a movable barrier operator with which the remote peripheral has been previously associated). When information from an unrecognized movable barrier operator is received for whatever reason or due to whatever circumstance, the remote peripheral can choose to simply ignore the information and thereby avoid taking a potentially inappropriate action.

Returning again to FIG. **3**, the process **30** then provides for automatic transmission **33** of the status condition message via the carrier/transmitter of choice and as otherwise is generally described above. It would of course be possible to transmit other signals and messages via the transmitter too, if desired. For example, specific control signals could also be transmitted (either as part of the above-described message or as a separate message) as an integral part of the overall control strategy of the movable barrier operator.

In a similar fashion, and referring now to FIG. **5**, the above-described remote peripheral **20** can serve as a suitable platform to effect a corresponding process **50** wherein the process **50** detects **51** for the reception of status condition signals and, upon receiving such a signal, uses the corresponding data to thereby permit effectuation **52** of a corresponding predetermined action. As already noted, the corresponding predetermined action (or actions) can be many and varied. A non-exhaustive illustrative listing could include:

activating a light (either ambient lighting and/or signaling indicia);
deactivating a light;
activating an audible alarm;
deactivating an audible alarm;
manipulating a locking mechanism;
providing a corresponding information display;
allowing remote modification of configuration variables; and
initiating a timing mechanism.

Other possibilities of course exist. It should also be clearly understood that functions not yet conceived or enabled may also be well served and supported by these embodiments, as these embodiments are not dependent upon the movable barrier operator having an already-existing native ability to support such functionality. Instead, by providing movable barrier operator status indicia, the remote peripherals are themselves able to intuit when circumstances are appropriate to initiate or restrain their own functionality and features.

Those skilled in the art will recognize that a wide variety of modifications, alterations, and combinations can be made with respect to the above described embodiments without departing from the spirit and scope of the invention, and that such modifications, alterations, and combinations are to be viewed as being within the ambit of the inventive concept. For example, if desired, the movable barrier operator could also wirelessly transmit control signaling in addition to the status condition information. Though such control signaling may not offer a same degree of long term flexibility as the preferred approaches set forth above, such control signaling may nevertheless serve to facilitate one or more presently known and highly desired features or functions.

As another example, and referring now to FIG. **6**, a remote peripheral controller **22** can also couple to a wireless transmitter **62**. In turn, the movable barrier operator controller **11** can further couple to a wireless receiver **61** that serves to compatibly receive messages as transmitted by the remote peripheral controller **11**. This link can mirror the carrier/modulation/protocol mechanism described above for the movable barrier operator-to-remote peripheral link, or it can be different. As an illustrative example, the movable barrier operator can have a wireless status condition data transmitter that uses an infrared carrier and a receiver that uses a radio frequency carrier. So configured, a variety of useful purposes can be served. As one example, the remote peripheral controller **22** can query the movable barrier operator controller **11** via this communication mechanism to thereby cause the movable barrier operator controller **11** to respond with, for example, an updated status condition data message.



I claim:

**1**. A movable barrier operator comprising:

a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states;

a movable barrier interface that is operably coupled to the controller;

a wireless status condition data transmitter that is operably coupled to the controller, wherein the wireless status condition data transmitter transmits a status condition signal that:

corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating states; and

comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator.

**2**. The movable barrier operator of claim **1** and further comprises at least one condition status sensor that is operably coupled to the controller.

**3**. The movable barrier operator of claim **2** wherein the wireless status condition data transmitter transmits data that corresponds to the at least one condition status sensor.

**4**. The movable barrier of claim **1** and further comprising a receiver that is operably coupled to the controller.

**5**. The movable barrier operator of claim **1** wherein the plurality of operating states includes at least one of:

moving a movable barrier in a first direction;
moving the movable barrier in a second direction;
reversing movement of the movable barrier;
halting movement of the movable barrier;
detecting a likely presence of an obstacle to movement of the movable barrier;
detecting a likely proximal presence of a human;
receiving a wireless remote control signal;
receiving a wireline remote control signal;
receiving a learning mode initiation signal;
a lighting status change;
a vacation mode status change;
detecting a likely proximal presence of a vehicle;
detecting the identification of a proximal vehicle; and
receiving an operating parameter alteration signal.

**6**. The movable barrier operator of claim **1** wherein the wireless status condition data transmitter comprises a radio frequency carrier-based transmitter.

**7**. The movable barrier operator of claim **1** wherein the wireless status condition data transmitter comprises an infrared carrier-based transmitter.

**8**. The movable barrier operator of claim **1** wherein the wireless status condition data transmitter comprises a sonic carrier-based transmitter.

**9**. The movable barrier operator of claim **1** wherein the controller includes transmitter control means for automatically causing the wireless status condition data transmitter to transmit a data signal.

**10**. The movable barrier operator of claim **9** wherein the transmitter control means automatically causes the wireless status condition data transmitter to transmit the status condition data signal in response to detecting at least a first predetermined condition.

**11**. The movable barrier operator of claim **10** wherein the first predetermined condition comprises at least one of the controller:

moving a movable barrier in a first direction;
moving the movable barrier in a second direction;
reversing movement of the movable barrier;
halting movement of the movable barrier;
detecting a likely presence of an obstacle to movement of the movable barrier;
detecting a likely proximal presence of a human;
receiving a wireless remote control signal;
receiving a wireline remote control signal;
receiving a learning mode initiation signal;
receiving an operating parameter alteration signal;
expiration of a predetermined duration of time; and
attainment of a predetermined point in time.

**12**. The movable barrier operator of claim **4** wherein the controller includes transmitter control means for automatically causing the wireless status condition data transmitter to transmit a status condition data signal in response to the receiver receiving at least a first predetermined signal.

**13**. The movable barrier operator of claim **12** wherein the wireless data transmitter comprises an infrared carrier-based transmitter and the receiver comprises a radio frequency carrier-based receiver.

**14**. A method comprising:
at a movable barrier operator:
detecting at least one predetermined condition as corresponds to a present operational status defined, at least in part, by at least two operating states, of the movable barrier operator;
in response to detecting the at least one predetermined condition, automatically wirelessly transmitting a status condition signal that:
represents the present operational status defined, at least in part, by the at least two operating states; and
comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator.

**15**. The method of claim **14** wherein detecting at least one predetermined condition includes detecting at least one of:
moving a movable barrier in a first direction;
moving the movable barrier in a second direction;
reversing movement of the movable barrier;
halting movement of the movable barrier;
detecting a likely presence of an obstacle to movement of the movable barrier;
detecting a likely proximal presence of a human;
receiving a wireless remote control signal;
receiving a wireline remote control signal;
receiving a learning mode initiation signal;
a lighting status change;
a vacation mode status change;
detecting a likely proximal presence of a vehicle; and
receiving an operating parameter alteration signal.

**16**. The method of claim **14** wherein detecting at least one predetermined condition includes:
monitoring a plurality of operational status conditions;
detecting the at least one predetermined condition when any of the plurality of operational status conditions occurs.

**17**. The method of claim **14** wherein detecting at least one predetermined condition includes at least one of:
receiving sensor information from a sensor that senses the at least one predetermined condition; and
monitoring an operating state of the movable barrier operator.



**18**. The method of claim **14** wherein automatically wirelessly transmitting a status condition signal includes automatically wirelessly transmitting a status condition signal using at least one of:
a radio frequency carrier;
a sonic carrier; and
an optical carrier.

**19**. The method of claim **18** and further comprising also using a wireline connection to transmit at least a portion of the status condition signal.

**20**. The method of claim **14** wherein automatically wirelessly transmitting a status condition signal includes automatically wirelessly transmitting a status condition signal that includes an identifier that corresponds to the movable barrier operator.

**21**. The method of claim **14** and further comprising: at a remote peripheral apparatus:
receiving the status condition signal;
in response to receiving the status condition signal, effecting a predetermined action that corresponds to the status condition signal.

**22**. The method of claim **21** wherein the predetermined action includes at least one of:
activating a light;
deactivating a light;
activating an audible alarm;
deactivating an audible alarm;
manipulating a locking mechanism;
providing a corresponding information display;
allowing remote modification of configuration variables; and
initiating a timing mechanism.

**23**. The method of claim **14** wherein detecting at least one predetermined condition includes receiving a wireless signal that includes, at least in part, an inquiry signal.

**24**. An apparatus comprising:
a movable barrier operator having:
a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states; and
a wireless status condition transmitter operably coupled to the controller, wherein the wireless status condition data transmitter transmits a status condition signal that:
corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating states; and
comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator;
a remote peripheral having:
a wireless receiver that is communicatively compatible with the wireless transmitter;
a peripheral controller that is operably coupled to the wireless receiver.

**25**. The apparatus of claim **24** wherein the plurality of operating states includes at least one of:
moving a movable barrier in a first direction;
moving the movable barrier in a second direction;
reversing movement of the movable barrier;
halting movement of the movable barrier;
detecting a likely presence of an obstacle to movement of the movable barrier;
detecting a likely proximal presence of a human;
receiving a wireless remote control signal;
receiving a wireline remote control signal;
receiving a learning mode initiation signal;

a lighting status change;
a vacation mode status change;
detecting a likely proximal presence of a vehicle; and
receiving an operating parameter alteration signal.

**26**. The apparatus of claim **24** wherein the remote peripheral comprises at least one of:
an informational display;
a light fixture;
a remote access interface;
a timer apparatus; and
an alarm.

**27**. The apparatus of claim **24** wherein the movable barrier operator further includes a wireless receiver that is operably coupled to the controller.

**28**. The apparatus of claim **27** wherein the remote peripheral further includes a wireless transmitter that is communicatively compatible with the wireless receiver of the movable barrier operator and that is operably coupled to the peripheral controller.



**29**. The apparatus of claim **24** and further comprising a plurality of the remote peripherals.

**30**. The apparatus of claim **24** wherein the peripheral controller includes reception means for determining when a wireless signal as received from the movable barrier operator includes an identifier that corresponds to the movable barrier operator.

**31**. The apparatus of claim **30** wherein the reception means further provides a first control signal when the wireless signal does include the identifier and does not provide the first control signal when the wireless signal does not include the identifier.

* * * * *

## PROOF OF SERVICE

I hereby certify that on October 13, 2016, I electronically transmitted this Nonconfidential Corrected Brief of Appellants to the Clerk of the Court using the Court's CM/ECF system. I further certify that counsel of record for Appellee are being served with either two paper copies and/or an electronic copy of this Brief by email, as follows:

***Counsel for Appellee***

*Via Email*
Maria Elena Stiteler
stiteler@fr.com
FISH & RICHARDSON P.C.
60 S. Sixth Street
Minneapolis, MN 55402
Telephone: (612) 335-5070
Facsimile: (612) 288-9696

*Via Email*
Nicole L. Little
nlittle@fitcheven.com
FITCH, EVEN, TABIN & FLANNERY LLP
120 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
Telephone: (312) 577-7000
Facsimile: (312) 577-7007

*Via FedEx and Email*
Katherine Vidal
vidal@fr.com
Matthew McCullough
mccullough@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street., Suite 500
Redwood City, California 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

*Via Email*
Benjamin C. Elacqua
elacqua@fr.com
Michael Rueckheim
rueckheim@fr.com
FISH & RICHARDSON PC
1221 McKinney Street, Suite 2800
Houston, Texas 77010
Telephone: (713) 654-5300
Facsimile: (713) 652-0109

*/s/ Jason C. White*
Jason C. White

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 10,132 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

3. This brief complies with the limitations set forth in Fed. Cir. R. 28(d) and contains 12 words (including numbers) marked as confidential.

*/s/ Jason C. White*
Jason C. White
*Counsel for Appellants, Techtronic Industries North America, Inc., One World Technologies Inc., OWT Industries, Inc., and Ryobi Technologies, Inc.*

Dated: October 11, 2016