NONCONFIDENTIAL
No. 16-2713

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**THE CHAMBERLAIN GROUP, INC.**

*Plaintiff-Appellee,*

v.

**TECHTRONIC INDUSTRIES CO., LTD.,**
**ET TECHNOLOGY (WUXI) CO., LTD.,**

*Defendants,*

**TECHTRONIC INDUSTRIES NORTH AMERICA, INC.,**
**ONE WORLD TECHNOLOGIES, INC., OWT INDUSTRIES, INC.,**
**RYOBI TECHNOLOGIES, INC.**

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division, Case No.1:16-cv-06097

## CORRECTED APPELLEE'S RESPONSIVE BRIEF

Katherine Vidal
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
E-mail: vidal@fr.com
Tel.: 650-839-5070
Fax: 650-839-5071

Benjamin C. Elacqua
Michael R. Rueckheim
FISH & RICHARDSON P.C.
1221 McKinney Street, Suite 2800
Houston, TX 77010
E-mail: Elacqua@fr.com
E-mail: Rueckheim@fr.com
Tel.: 713-654-5300
Fax: 713-652-0109

*Counsel for Plaintiff-Appellee The Chamberlain Group, Inc.*

## U.S. Patent No. 7,224,275, Claim 1 (Appx41-49)

**1.**    A movable barrier operator comprising:

a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states;

a movable barrier interface that is operably coupled to the controller;

a wireless status condition data transmitter that is operably coupled to the controller, wherein the wireless status condition data transmitter transmits a status condition signal that:

    corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating states; and

    comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator.

## Certificate of Interest

Counsel for Plaintiff-Appellee certifies the following:

**1.    The Full name of each party represented by me is:**

The Chamberlain Group, Inc. ("CGI")

**2.    The name of the real party in interest (if the party named in the caption is not the real party in interest represented by me is:**

The Chamberlain Group, Inc.

**3.    Parent corporations and any publicly held companies that own 10% or more of the stock of the party are:**

The Duchossois Group, Inc.

**4.    The name of all law firms and the partners or associates that appeared for each party now represented by me in the trial court or are expected to appear in this Court is:**

Fish & Richardson P.C.:  Katherine Vidal; Benjamin C. Elacqua; Michael R. Rueckheim; Maria Elena Stiteler; and Matthew R. McCullough.

Fitch Even, Tabin & Flannery LLP:  Nicole R. Little.

Katherine Vidal
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
E-mail: vidal@fr.com
Tel.: 650-839-5070
Fax: 650-839-5071

*/s/ Michael R. Ruckheim*
Michael R. Rueckheim
Benjamin C. Elacqua
FISH & RICHARDSON P.C.
1221 McKinney Street, Suite 2800
Houston, TX 77010
E-mail: Elacqua@fr.com
E-mail: Rueckheim@fr.com
Tel.: 713-654-5300
Fax: 713-652-0109

# Table of Contents

STATEMENT OF RELATED CASES ................................................................. 1

JURISDICTIONAL STATEMENT .................................................................. 1

PRELIMINARY STATEMENT ...................................................................... 2

STATEMENT OF THE ISSUES...................................................................... 4

STATEMENT OF THE CASE AND FACTS.................................................... 5

   I.   THE PARTIES TO THE LITIGATION........................................................ 5

      A.   The Chamberlain Group Inc. ("CGI") ..................................... 5

      B.   Appellants ("TTI").................................................................... 6

   II.   THE TECHNOLOGY AT ISSUE ............................................................. 6

      A.   The '275 patent's improvement over the prior art external sensor approach ........ 8

      B.   CGI's MyQ® GDO technology............................................ 11

   III.   TTI'S ENTRY TO THE MARKET ........................................................ 12

   IV.   BACKGROUND LEADING TO THE PRESENT "CLAIM CONSTRUCTION" DISPUTE ............................................................ 15

   V.   THE DISTRICT COURT'S GRANT OF A PRELIMINARY INJUNCTION................ 17

   VI.   THE CURRENT CLAIM CONSTRUCTION BRIEFING OCCURING IN THE DISTRICT COURT ............................................................. 18

SUMMARY OF ARGUMENT ...................................................................... 20

STANDARD OF REVIEW ............................................................................ 23

ARGUMENT .............................................................................................. 24

   I.   THE DISTRICT COURT CORRECTLY FOUND THAT TTI DID NOT RAISE A SUBSTANTIAL QUESTION OF INVALIDITY......................... 24

      A.   The District Court's Claim Construction Was Correct....................................... 25

      B.   TTI's Prior Art Does Not Invalidate The Asserted Claims .................................. 33

   II.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT CHAMBERLAIN WAS LIKELY TO SUFFER IRREPARABLE HARM.................... 48

      A.   The District Court Properly Found that Chamberlain's Irreparable Harm Stems from TTI's Infringement............................................... 48

      B.   The District Court Did Not Abuse Its Discretion in Finding Chamberlain Likely to Be Irreparably Harmed by Lost Market Share Due to TTI's Infringement.......... 50

      C.   The District Court Did Not Abuse Its Discretion in Finding Chamberlain Likely to Be Irreparably Harmed by Lost Accessory Sales ................................................. 53

D.  The District Court Did Not Abuse Its Discretion in Finding Chamberlain Likely to Be Irreparably Harmed by Price Erosion Due to TTI's Infringement .................. 54

E.  Other Forms of Price Erosion, Including Harm to Customer Goodwill and Business Relationship, Also Support a Finding of Irreparable Harm................... 56

III.  THE PRELIMINARY INJUNCTION RESTS SOLELY ON THE '275 PATENT, NOT THE '966 PATENT ................................................................................................ 57

CONCLUSION.................................................................................................................. 57

CERTIFICATE OF COMPLIANCE ............................................................................ 60

## STATEMENT OF CONFIDENTIALITY

Materials redacted from pages 13, 22, 48, 49, 51, 54, of the nonconfidential version of Appellee's Responsive Brief were filed under seal or redacted below, pursuant to the joint protective order filed with the district court on October 12, 2016. This material consists of proprietary business information not available to the public, including the functionality of technology alleged to constitute trade secrets and financial/revenue information.

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
  544 F.3d 1341 (Fed. Cir. 2008)........................................................20

*Anderson v. U.S.F. Logistics (IMC), Inc.*,
  274 F.3d 470 (7th Cir. 2001) .................................................36, 44, 53

*Apple Inc. v. Samsung Elecs. Co.*,
  809 F.3d 633 (Fed. Cir. 2015)..........................................................46, 51

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,
  661 F.3d 629 (Fed. Cir. 2011)...........................................................39

*Caterpillar Inc. v. Sturman Indus., Inc.*,
  387 F.3d 1358 (Fed Cir. 2004)........................................................38, 41

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012)..........................................................52

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013).........................................................49

*Gordon v. United States*,
  117 U.S. 697 (1864).......................................................................1

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)....................................................................30, 41

*Nutrition 21 v. United States*,
  930 F.2d 867 (Fed. Cir. 1991)............................................................50

*Polymer Techs., Inc. v. Bridwell*,
  103 F.3d 970 (Fed. Cir. 1996).........................................................47, 52

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  702 F.3d 1351 (Fed. Cir. 2012).........................................................49

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011)...............................................20, 47, 48, 52

*Sierra Club v. Morton*,
  405 U.S. 727 (1972)................................................................................1

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  135 S. Ct. 831 (2015).................................................................21, 31, 32

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
  748 F.3d 1159 (Fed. Cir. 2014).............................................................47

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...................................................................................47

**Statutes**

28 U.S.C. § 1292(c)(1)..................................................................................1

**Other Authorities**

Fed. Cir. R. 25(a) and 25(b).......................................................................57

Fed. R. App. P. 25......................................................................................57

FRAP 32(a)(7)(B).......................................................................................58

## STATEMENT OF RELATED CASES

Undersigned counsel is unaware of any case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

Appellee CGI agrees that this Court has jurisdiction pursuant to 28 U.S.C. § 1292(c)(1) over this appeal of the portion of the district court's order granting a preliminary injunction. However, CGI does not agree with TTI's request for this Court to determine issues with respect to CGI's U.S. Patent No. 7,635,966 ("the '966 patent"). The district court did not grant a preliminary injunction with respect to the '966 patent or issue any decision appealable to this Court. This Court does not have jurisdiction to issue advisory opinions. *See Gordon v. United States*, 117 U.S. 697, 702 (1864); *see Sierra Club v. Morton*, 405 U.S. 727, 732 n.3 (1972) ("Congress may not confer jurisdiction on Art. III federal courts to render advisory opinions . . . because suits of this character are inconsistent with the judicial function under Art. III.").

## PRELIMINARY STATEMENT

The '275 patent discloses novel methods by which garage door openers ("GDOs") and other moveable barrier operators communicate with external peripherals. In the prior art, GDOs were not smart and were limited to receiving information from various external sensors (such as the sensors that detect the presence of a person when the GDO is closing). The '275 patent's inventor found this approach limiting and developed a way for a GDO to develop and transmit its own operating state information from the GDO to various peripherals, paving the way for the GDO to play an active role in remote access home automation.

This idea is captured in the appealed claims by their requirement of "a controller having … potential operational status conditions"—such that the GDO itself has such conditions and can report them to a user, and does not need to obtain condition information from separate sensors. That approach reduces cost and complexity, while expanding the GDO's capabilities. Below, Chamberlain and the court referred to such a "smart" GDO as being "self-aware"—a shorthand for this claim language. TTI's brief on appeal suggests that this short-hand is a separate feature read into the claims, when in fact the feature is explicit in the claims and specification, and the term "self-aware" was nothing more than a shorter way of expressing the feature.

TTI's recasting of the "self-aware" shorthand as something it never was, is TTI's only argument for success on the merits, so it fails on appeal from the start.  TTI's second failing on appeal is to broadly argue that the district court abused its discretion in determining validity—without identifying any clear error in the court's analysis and ignoring that the district court heard substantial evidence including a three-day hearing where the district court questioned expert witnesses.  CGI's third failing on appeal is to argue that the district court abused its discretion in finding irreparable harm. That CGI sold more doors after TTI started infringing is irrelevant because those additional sales came from lowering the price of CGI's doors to consumers, and the district court was certainly entitled to conclude that CGI would end up absorbing those costs. Thus, none of the bases that TTI identifies on appeal provides a basis for disturbing the district court's analysis, and the Court should give deference to the district court's findings and affirm.

## **STATEMENT OF THE ISSUES**

The ultimate issue is whether the district court abused its discretion in granting a preliminary injunction enjoining Appellants from selling their newly introduced infringing garage door opener, the Ryobi GD200.  The issues relevant to this appeal are:

(1)    Did the district court abuse its discretion in construing the claims under their plain and ordinary meaning when both sides used the plain and ordinary meanings of the claims in discussing the infringement and validity issues?

(2)    Did the district court abuse its discretion in finding that Appellants had not raised a substantial question as to invalidity?

(3)    Did the district court abuse its discretion in finding that CGI was likely to suffer irreparable harm from lost market share, price erosion, and lost accessory sales in the absence of a preliminary injunction?

## STATEMENT OF THE CASE AND FACTS

## I.    THE PARTIES TO THE LITIGATION

### A.    The Chamberlain Group Inc. ("CGI")

Since the 1950's, Illinois-based CGI has invested substantial resources to develop the safest and most innovative residential moveable barrier operators, e.g., garage door openers ("GDOs"), on the market.  Appx1-2; Appx1462-1465 ¶¶ 5, 8-12; Appx1485-1486 ¶¶ 4-6.  Today, CGI has expanded beyond traditional GDOs to become a market leader for GDO-integrated technology and remote home connectivity through the GDO.  Appx1-2; Appx1486 ¶ 7; Appx1487 ¶ 12.  Core to this new technology is CGI's development of GDOs that can wirelessly send internal state information to peripheral devices such as smartphones.  Appx1-2; Appx1486 ¶¶ 8, 9.  CGI has obtained over 350 patents on its innovations, most related to GDOs; has created hundreds of jobs in the United States (most in Illinois); and has secured the safety of tens of millions of American homes.  Appx1-2; Appx1485-1486 ¶¶ 3, 7; Appx1464 at ¶ 17.  As explained by CGI's director of intellectual capital, Mr. Jim Fitzgibbon, during the preliminary injunction hearing:

> Q. Why does Chamberlain have so many patents?
>
> A. The -- as I said before, it helps with the health of the company. It also helps us because *we spend a lot of time, effort, and money on the development of new technologies, and we want to make sure that we're able to at least protect them.*

Appx6047 at 63:1-5. As a result, CGI's products have a reputation for safety, security, and reliability, and CGI has received accolades as an innovation leader in its field of technology. Appx1485-1486 ¶ 6.

### B. Appellants ("TTI")

Until this year, TTI was not a direct competitor of CGI and had never sold a GDO. Appx3, Appx17. Then, in May 2016, TTI abruptly entered the GDO market, launching on a short development cycle the Ryobi GD200 garage door opener ("Ryobi GDO")—a GDO that competes head-to-head with CGI, and indeed is CGI's "sole competitor" for the increasingly popular high-end GDOs. Appx3360 at ¶ 6); *see also* Appx6229 at 244:7-18. The record shows that TTI's quick entrance to the market came on the back of CGI's decades of efforts and investment, including CGI's substantial investment in patent protection. *See* Appx6284-6285 at 299:17-300:1 (Mr. Bakewell testimony at PI Hearing, discussing Appx5385); see also Appx5362-5374 (TTI document basing benchmark manufacturing quote on CGI GDO).

## II. THE TECHNOLOGY AT ISSUE

CGI asserts in the district court that TTI infringes claims of two of CGI's U.S. Patents: U.S. Patent No. 7,224,275 ("the '275 patent") and 7,635,966 ("the '966 patent). At issue on appeal are the '275 patent claims 1 and 5.

The '275 patent describes wirelessly communicating the status of features associated with the environment of modern garage door openers, while also providing users the security and assurance of knowing that the monitored status that is being communicated to them is the one associated with their garage door opener and that they are not receiving the status sent from their neighbors' GDOs. Claim 1 of the '275 patent recites:

> 1. A movable barrier operator comprising:
>
> a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states;
>
> a movable barrier interface that is operably coupled to the controller;
>
> a wireless status condition data transmitter that is operably coupled to the controller, wherein the wireless status condition data transmitter transmits a status condition signal that:
>
> corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating states; and
>
> comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator.

'275 Patent, Claim 1. Claim 5 is a dependent claim that identifies fourteen specific operating states, for example "moving a movable barrier in a first direction" or "a vacation mode status change."

## A.    The '275 patent's improvement over the prior art external sensor approach

The '275 patent's "background" section provides an overview of the prior art approach.  The patent discloses that "[o]ver time, the capabilities of and features supported by moveable barrier operators has expanded to include actions other than merely opening and closing a moveable barrier."  '275 Patent, 1:31-34.  These developments required that GDO manufacturers perform the costly process of configuring each GDO to interface with a wide variety of potential sensors and other peripherals.  '275 Patent, 1:49-63.  This resulted in additional costs, wiring and installation time as well as compatibility issues:

> A physical interface [had to be] provided to support numerous potentially utilized peripheral devices (including but not limited to sensors, control surfaces, alarms, displays, ambient and/or spot lighting, and so forth).  This physical interface can represent undesired additional cost when part of the interface goes unused in a given installation.

> Furthermore, even when a given installation includes use of all potentially supported peripherals, the physical installation itself will often necessarily include a physical signaling path to couple the moveable barrier operator to the various peripherals.  This in turn can result in undesired exposed wiring and/or undesired increase of installation time.

'275 Patent, 1:57-2:3; *see also id.* at 2:4-16 (discussing compatibility issues).

The '275 patent describes the prior art external sensor approach as "partially or wholly inadequate."  '275 Patent, 2:17-20.  The '275 patent's claim 1 recites a solution to this problem: a novel GDO that includes "a controller having …

8

potential operational status conditions" and transmitting a "status condition signal" that corresponded to the operating states that defined the controller's potential conditions. '275 Patent, Claim 1. One advantage of claim 1's approach is that the controller itself can transmit useful information about its own status conditions, making the system less reliant upon information from external sensors and the accompanying costs, complexity and compatibility issues.

During the three-day preliminary injunction hearing, the '275 patent's inventor, Mr. James Fitzgibbon, explained the conception and realization of his invention. When he was working on a solution to control an overhead garage light from a garage door opener located remote from the light, he conceived of the idea of replacing the wiring conventionally used between GDOs and lights in commercial applications, and the line-of-sight signals used in residential openers, with a transmitter in the GDO itself. He testified that as he worked through this invention, he envisioned a "smart" GDO that could be used as the focal point for home automation. As he explained, his invention was a GDO that would monitor and communicate its own status and actions to peripherals allowing those peripherals to receive key information on which they could act. Appx6055-6056 at 71:23-72:2.[1] With the ability to monitor and transmit its own status conditions, the

---

[1] For example, one of CGI's earliest products encompassing this invention were devices, such as those plugged into a wall outlet, that would receive information

GDO can direct and control peripherals such as lights and alarms and can provide

key status information to remote devices, enabling users to monitor their homes.

Appx6055 at 71:21-72:2, Appx6056 at 72:3-74:1.

Mr. Fitzgibbon provided a block diagram of his invention in Figure 1 of the

patent:



'275 Patent, Fig. 1.

As Mr. Fitzgibbon explained, and as is common in patent parlance, the

invention (claims 1 and 5 as relevant here) necessarily includes the boxes with

solid lines in Figure 1: the transmitter 15, the movable barrier interface 12 (that

moves the movable barrier 13 or garage door) and a controller 11 which "can be

self-aware of such operational status conditions (as when, for example, the

---

about the GDO's status, e.g., whether the GDO had opened or closed a garage
door, allowing a user to use that information to decide whether to turn lights on or
off that were located inside and outside of a residence. Appx6056-6057 at 72:3-
73:1.

controller 11 is aware that it has switched a given ambient light fixture on or off)."
'275 Patent, 4:51-55; Appx6050-6051 at 66:1-67:1. The dashed lines of the status
condition sensors 14 indicate that it is "not necessarily needed for the claim,
invention."  Appx6051 at 67:2-8.

Mr. Fitzgibbon also explained that Claim 2[2] (not at issue on appeal) adds in
the optional status condition sensor(s) 14.  Appx6052 at 68:4-9; *see also* '275
Patent, Claim 3 ("wherein the wireless status condition data transmitter transmits
data that corresponds to the at least one condition status sensor").  In this manner,
claims 2 and 3 combine the novel approach recited in claim 1 (transmitting a
"status control signal" that corresponds to the controller's operating states) with the
prior art features of transmitting information from external sensors, and thereby
increase the information resources that are available for the system. *See* '275
Patent, 4:52-63 (describing the difference between the controller 11 being self-
aware and the "controller being provided with externally developed information
regarding the condition" which can be derived from "status condition sensors 14").

### B.    CGI's MyQ® GDO technology

CGI's MyQ® products practice the wireless status update feature of the '275
patent and have been met with tremendous industry success and industry praise.

---

[2] Claim 2 recites: "The movable barrier operator of claim 1 and further comprises
at least one condition status sensor that is operably coupled to the controller."

*See, e.g.*, Appx6047-6048 at 63:6-64:10; Appx1486 at ¶¶ 8-9; Appx1591-1641; Appx1642-1643.  The MyQ® technology allows users to remotely monitor and control garage doors, lights, and gates in their homes and businesses with their smartphones.

Mr. Fitzgibbon used an internal CGI technical specification during the preliminary injunction hearing to show how the MyQ® products practice the '275 patent's approach, including showing the bit format for the signal's message data field illustrating how the GDO's signals were defined by two or more operating states that corresponded to the GDO controller's potential operational status conditions. *See* Appx6063-6064 at 79:12-80:14 (explaining "when [the GDO] sends out the message, the message is the present one that's active, so when the door is at the up limit, it would send out the number 0001.  So there's specific numbers that would be transmitted as the state identification as the status from the operator") (discussing the technical specification included at Appx1832-1876)). With MyQ® products, the GDO transmits potential states of "the operator itself." Appx6063-6064 at 79:12-80:14.

## III.    TTI'S ENTRY TO THE MARKET

In approximately May of 2016, TTI launched the Ryobi GDO exclusively at The Home Depot, Inc. ("Home Depot").  On launch, the Ryobi GDO price was set at $248. Appx1489 at ¶ 19 & Appx1649.  Among its features, the Ryobi GDO

CONFIDENTIAL INFORMATION REMOVED FROM THIS PAGE

offers connectivity straight out of the box, so that users can monitor the status of

the GDO, for example by checking whether the garage door opener is open or

closed. *Id.*; Appx3; Appx1290 at ¶ 6 & Appx1330; Appx6497-6500 at 510:21-

513:7.

The GDO market is relatively inelastic, with customers tending to purchase

GDOs for newly constructed garages or to replace a broken GDO.[3]  Appx15;

Appx1487 at ¶11; Appx6203 at 219:21-24. Pre-launch, Chamberlain was the major

player in what was essentially a two-player market, with approximately ▮% of all

GDOs sold in the United States.  Appx3975 at ¶¶ 93-94; Appx4031; Appx4620;

Appx6280-6281 at 295:3-296:4.

With TTI's entry to the GDO market, TTI and CGI were direct competitors.

Appx3364 at ¶ 6. The Ryobi GDO was primarily positioned against CGI's high

price point HD950WF model, sold at the time at Home Depot for the suggested

retail price of $268.  Appx6149 at 165:17-25; Appx6229 at 244:7-18; *see also*

Appx2002. The HD950WF and the Ryobi GDO shared a similar feature set,[4]

---

[3] The market does seem to be price-sensitive, in that changes in the price of a
particular GDO will have an impact on the demand of that particular GDO relative
to other GDOs. Appx6295-6297 at 310:17-22; 311:14-312:6. However, the overall
number of GDOs sold is largely a function of the housing market and replacement
sales. Appx6203 at 219:10-20; Appx6295-6296 at 310:23-311:8.

[4] In fact, evidence shows that CGI "adapted" its Ryobi GDO from the precursor to
the HD950WF (the HD930EV). Appx6284-6285 at 299:17-300:1 (Mr. Bakewell
testimony at PI Hearing, discussing Appx5385); *see also* Appx5362-5374 (TTI
document basing benchmark manufacturing quote on CGI GDO).

including the ability to wirelessly monitor and control the status of the GDO out of the box, without purchasing or installing any additional components.  Appx6229-6230 at 244:7-245:7; Appx3360 at ¶ 6. This feature was important to TTI and to Home Depot—so important, in fact, that Michael Farrah, the president of the Power Tools Group at One World Technologies, Inc., stated that there was a "mandate" from Home Depot that the GDO include connectivity.  Appx2834 – Appx2835 at 145:4-146:6.  As Mr. Farrah explained, it was one of two features that Home Depot insisted must "be part of the product to make it on the shelf." Appx2835 at 146:7-11.

Given the inelasticity of the market, it is no surprise that sales of the HD950WF fell immediately after the Ryobi GDO entered the market.  Appx3, Appx15; Appx1489 at ¶ 20 & Appx1657-1658.  In mid-June, after a number of weeks of lowered sales, the Home Depot dropped the retail price on the HD950WF by $40 to $228. Appx3-4, Appx15; *see also* Appx3364 at ¶ 21 & Appx3578. (The price on the HD950WF was first dropped in six test cities and supported by CGI through a rebate; the reduction in price was later extended to all U.S. markets without CGI's financial support. Appx6150-6152 at166:1-6, 166:11-168:9.)  In late August, Home Depot raised the price to $244—$24 less than the original price for the HD950WD and just $5 less than retail price of the Ryobi GDO. Appx6150 at

166:4-6; Appx3364 at ¶ 21 & Appx3585-3586.  The price of the HD950WF

remains at $244 today.

## IV.    BACKGROUND LEADING TO THE PRESENT "CLAIM CONSTRUCTION" DISPUTE

CGI filed its preliminary injunction motion ("PI Motion") on the same day

that it filed its Complaint for the underlying district court matter—on June 10,

2016, shortly after the Ryobi GDO entered the market.  Appx1221-1248.  CGI

included a very thorough and detailed fifty-one page expert declaration in support

of its PI Motion.  Appx1659-1709.  CGI's expert explained that he "used the

ordinary and customary meanings" in applying his analysis.  Appx1664 at ¶ 26.

Similarly, CGI's PI Motion identified that no claim construction was necessary,

"because the claim terms are written in plain, understandable language…."

Appx1235-1236.

TTI filed its opposition to the PI Motion two months later—on August 2,

2016.  TTI also submitted an expert declaration in support of its opposition.  TTI's

expert explained that he used the "plain and ordinary meaning of the claims" in

preparing his analysis.  Appx2244 at ¶ 20.  TTI's opposition alleged that prior art

that transmitted information developed by external sensors met the "controller

having … potential operational status conditions" limitation.  Appx2257 at ¶¶ 64-

65 (discussing Menard's disclosure of "a garage door position sensor," "magnetic

switch[es]" and" auxiliary sensors").

CGI filed its reply briefing on August 25, 2016. CGI's reply briefing showed how TTI failed to raise a substantial question of invalidity because it only identified prior art that "transmit[s] *external sensor* information to the GDO." Appx3091. CGI showed how TTI's prior art did "not disclose transmitting a signal corresponding to a GDO controller's operating states" as required by the plain claim language. *Id.* CGI submitted an additional expert declaration with its reply that accorded. Appx3170 at ¶ 104 ("*Claim 1* of the '275 Patent explains that the operational status conditions are conditions *of the controller* (rather than of any external sensor) *by requiring* '*a controller having* a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states.'") (emphasis added).

To help explain the genesis for the plain claim language, CGI identified language in the '275 patent's specification that described the differences between a controller *having* potential operational status conditions (as claimed), and a controller that simply acts as a pass-through to route information received from external sensors. The '275 patent includes clear statements illustrating the difference between the Menard prior art approach and the '275's claim 1 approach:

> Depending upon the needs of the setting, *the controller 11 can be self-aware* of such operational status conditions (as when, for example, the controller 11 is aware that it has switched a given ambient light fixture on or off) *or* the controller 11 can be *provided with externally developed information* regarding the condition. To effect the latter,

> it may be desirable in some settings to use one or more
> status condition sensors 14.

'275 patent, at 4:52-57 (emphasis added). The '275 patent's claim 1 recites the first

scenario, where the "controller [has] a plurality of potential operational status

conditions defined, at least in part, by a plurality of operating states" and the '275

patent's claim 2 corresponds to the second scenario by reciting the additional

limitation of "at least one condition status sensor."  Appx3091.

The parties and the district court then used the term "self-aware" as a short-

hand for a requirement derived from the plain language of the claim itself—

namely, that it is Claim 1's controller (not, for example, some external sensors)

that **has** the potential operational status conditions required by the claim.  *See, e.g.*,

Appx7 ("[Dr.] Rhyne explained that the crux of his infringement analysis revolved

around the concept of the GDO controller being self-aware, ***i.e., that it did not rely***

***upon any external sensors to obtain the*** <u>***status conditions of the***</u> ***GDO***.")

## V.   THE DISTRICT COURT'S GRANT OF A PRELIMINARY INJUNCTION

Approximately two weeks after the preliminary injunction hearing, the

district court informed both parties that it planned to grant CGI's motion for a

preliminary injunction.  Appx6644; Appx6646. The court's memorandum order

explained that the Ryobi GDO likely infringes the '275 patent—a holding that TTI

does not challenge on appeal.[5]  Appx7-9.  The district court also explained that there was no substantial question of validity.  Appx9-10.

With respect to the irreparable harm prong, the district court found that CGI was likely to suffer three types of irreparable harm stemming from TTI's infringement: lost market share, price erosion, and lost accessory sales.  Appx14-16. The district court also found that these harms were "directly connected to the entry of the TTI Ryobi GDO" to the market. Appx16. The court also found that the balance of hardships tipped in CGI's favor, as GDOs were CGI's "core business," while TTI had never sold a GDO before May of 2016.  Appx17. The court further reasoned that any harm would be minimized because it had scheduled the trial for February 6, 2017, a mere three months away. Appx17. Finally, the court reasoned that the public interest lay in favor of protecting CGI's patent rights. Appx18.

## VI.    THE CURRENT CLAIM CONSTRUCTION BRIEFING OCCURING IN THE DISTRICT COURT

During the preliminary injunction stage, both parties discussed infringement and validity in terms of the plain and ordinary meaning of the claims.  However, after filing this appeal, TTI abandoned its prior argument that the plain claim language encompassed a GDO receiving information from external sensors.

---

[5] The district court also explained that TTI likely infringed the '966 patent, Appx11-12, but ultimately did not enjoin infringement of the '966 patent, Appx17. As a result, this finding is not currently on appeal.

Instead, through TTI's *Markman* briefing, TTI now asks the district court to re-draft claim 1's "a controller having … potential operational status conditions" limitation to recite:

> a programmable device, such as microprocessor or microcontroller, ***that can determine, with or without the use of a sensor***, two or more conditions of the movable barrier operator, where each condition is determined by at least two actions involving the movable barrier operator at a particular time.

*See* N.D. Illinois Case No. 1:16-cv-6097, Dkt. No. 151 (TTI's October 28, 2016 claim construction brief).  In addition to importing limitations into the claim to narrow it for infringement purposes (*see, e.g.,* "microprocessor or microcontroller," "action," "at a particular time"), TTI is requesting that the district court re-draft claim 1's recital of possessive terminology ("a controller having …") into active terminology (a controller "that can determine …") in order to broaden one aspect of the claim relating to TTI's invalidity positions.  CGI opposes this proposed construction which attempts to substantially broaden claim 1 to encompass the external sensor prior art and which renders superfluous claims 2 and 3.  CGI maintains its position that the plain claim language requires a controller having potential operational status conditions, and does not encompass a controller that can merely receive information from external sensors.)

## SUMMARY OF ARGUMENT

The district court correctly concluded that TTI failed to raise a substantial question of invalidity.  First, the district court's claim construction was correct.  The plain language of claim 1 of the '275 patent requires a "controller having … potential operational status conditions," not a controller that can determine actual conditions of external sensors.   This construction reads the claim terms in the context of the claim language and the intrinsic record.

TTI's remaining arguments are misplaced.  The district court did not find that "because Claim 2 has sensors (like Menard), Claim 1 cannot have sensors," Opening Br. at 25-26, but instead merely acknowledged the differences in the claim language.  Nor did the district court misinterpret the prosecution history.  Finally, TTI's argument with respect to Claim 5 is wrong, because the district court rejected TTI's argument that Claim 5 is inoperable without external sensors after evaluating the expert testimony. *See* Appx8-9.

TTI's prior art does not invalidate the asserted claims. The district court considered substantial evidence, questioned expert witnesses, and issued a well-reasoned decision that is entitled to deference under the abuse of discretion standard.  The Menard reference does not anticipate the asserted claims because substantial evidence showed Menard solely relied upon external sensors. Further, Menard does not describe the message format or ***any other*** information showing

disclosure of the claimed "a present operational status condition *defined*, at least in part, *by at least two operating states from the plurality of operating states*." '275 patent claim 1. Nor does Menard's Bluetooth device satisfy claim 1 of the '275 patent's "identifier that is at least relatively unique to the moveable barrier operator." Finally, the Menard reference does not disclose a "self-aware controller."

TTI's argument that the "use of a 'self-aware' controller with Menard is obvious" was never raised with the district court, and it would be improper for this Court to decide this argument for the first time. Nor is this argument supportable where TTI has failed to identify any specific prior art that allegedly discloses the claimed features and failed to identify any reason prompting a person of skill to combine prior art the features.

The district court properly addressed and rejected TTI's arguments with respect to the Tazumi reference. Further, TTI only briefly mentioned Tazumi in a footnote prior to the hearing on the preliminary injunction, and TTI's theory about a self-aware controller in Tazumi was only mentioned for the first time during the preliminary injunction hearing in a cursory manner. The district court considered substantial evidence establishing Tazumi's sole reliance upon external sensors. The district court also heard evidence regarding secondary considerations, which

CONFIDENTIAL INFORMATION REMOVED FROM THIS PAGE

TTI does not mention in its brief and is an alternative basis upon which this Court can affirm the preliminary injunction.

The district court also did not abuse its discretion in finding that CGI was likely to suffer irreparable harm.  The district court held that the recent launch of the Ryobi GDO was "directly connected" to the lost market share, lost accessories, and price erosion that Chamberlain stood a substantial risk of suffering if a preliminary injunction was not entered.  Further, there was significant evidence before the district court connecting the '275's patented technology with TTI's customers' desire for a connected GDO, including the admission of the president of the Power Tools Group at One World Technologies, Inc., that the Ryobi GDO's infringing connectivity feature was a "███████████ that helps ██ ."

The district court did not abuse its discretion by finding that the infringing features of the Ryobi GDO would likely cause Chamberlain to lose market share and lost accessories, and therefore suffer irreparable harm.  The district court found it was likely—not merely possible—that Chamberlain would lose market share to TTI. In the two-player, inelastic GDO market, this alone was enough for the district court to find a likelihood of lost market share that could not easily be recovered.  The district court also made a number of factual findings supporting the conclusion that Chamberlain not only *likely* lost market share, but *actually* lost market share to the infringing Ryobi GDOs.

Nor did the district court abuse its discretion by finding price erosion. Since the entry of the Ryobi GDO to the market, the price of CGI's comparable GDO has dropped. Home Depot has already sought contribution from Chamberlain for this reduction in price, and substantial evidence supports the district court's common-sense conclusion that it will continue to pass the pricing pressure back to Chamberlain. Moreover, even if the price difference is not passed back on to CGI, it nonetheless harms CGI in ways that are not easily quantifiable. Finally, other forms of price erosion, including harm to customer goodwill and business relationship, also support a finding of irreparable harm.

## STANDARD OF REVIEW

The Federal Circuit reviews the grant of a preliminary injunction for abuse of discretion. *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1345 (Fed. Cir. 2008). "It is well settled that the granting of a temporary injunction, pending final hearing, is within the sound discretion of the trial court; and that, upon appeal, an order granting such an injunction will not be disturbed unless contrary to some rule of equity, or the result of improvident exercise of judicial discretion." *Id.* (quoting *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940)). A court abuses its discretion when it acts "based upon an error of law or clearly erroneous factual findings or commits a clear error of judgment." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1147 (Fed. Cir. 2011) (quotation marks omitted).

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY FOUND THAT TTI DID NOT RAISE A SUBSTANTIAL QUESTION OF INVALIDITY

The district court correctly concluded that TTI failed to raise a substantial question of invalidity.  The district court's factual findings with respect to anticipation and claim construction must be accepted unless they are clearly erroneous. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). This is particularly true here, where the district court heard live testimony and posed questions to each side's expert witnesses as to the meaning of the claim terms and the application of the prior art to the asserted claims. *Id.* at 838-839 ("Federal Circuit judges lack the tools that district courts have available to resolve factual disputes fairly and accurately such as questioning the experts") (internal citations omitted); *see* Appx6124-6126 at 140:18-142:19 (district court questioning CGI's expert witness).

In its opening brief, TTI does not contest that CGI is likely to succeed in showing that the Ryobi GDO infringes the '275 patent.  Instead, TTI argues that the district court erred in (i) construing the "controller" claim term to require "a self-aware processor"; and (ii) finding that TTI did not raise a substantial question of invalidity under the plain claim language.  Each of these arguments are flawed.

## A.    The District Court's Claim Construction Was Correct

### 1.    The plain claim language requires a controller having potential operational status conditions—not a controller that can determine actual conditions by receiving information from external sensors

TTI's primary argument is that the district court improperly construed the term "controller having … potential operational status conditions" in claim 1 of the '275 patent by reading in a "self-aware" limitation.  TTI is incorrect.

The district court properly construed the claim terms in the context of the claim language and the intrinsic record.  Claim construction begins with the language of the claim.  Here, Claim 1 is directed to a "moveable barrier operator" that includes a specific type of controller: "***a controller having*** a plurality of ***potential operational status conditions*** defined, at least in part, by a plurality of operating states." '275 patent at Claim 1 (emphasis added).  The potential operational status conditions are internal conditions of the controller – they are the conditions the controller "has" not conditions or states of some external sensor that the controller receives.[6]  By using the possessive term "having" the patent applicant is referring to potential operational status conditions of the controller itself.  *See* '275 patent at 6:35-36 (discussing "the ability of the controller to self-

---

[6] Claim 1 further recites transmitting a signal corresponding to the operational status condition that is defined by the controller's states. *Id.* ("a status condition signal that corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating states").

monitor *its own operational status*") (emphasis added).  This is further confirmed

by the recital of the word "potential" which is commonly used to refer to a latent or

existing quality of something, here a controller, that has not yet been realized.  The

claimed GDO controller's conditions transform from <u>potential</u> to <u>present</u> (or

actual) conditions when a current value associated with the condition is realized at

any given instant in time.[7]

Indeed, before being asked to differentiate the prior art at the PI hearing,

TTI's own expert agreed that the potential conditions are defined aspects of the

controller itself:

> Q. It says, "The controller having a plurality of potential operational
>
> A. -- status conditions, yeah.
>
> Q. Defined at least in part by a plurality of operating states?
>
> A. That's right. So the controller has potential operational status
> conditions defined in it.

Appx2989 at 217:5-12.  *See also* Appx6126 at 142:4-19 (CGI's expert discussing

that potential operational status conditions are internal conditions of the controller,

---

[7] TTI's citation to Dr. Rhyne's testimony regarding a non-self aware controller are inapposite.  *See* Opening Br. at 24 (citing to Appx6124).  CGI agrees that "the fact that [a] controller has operational status conditions does not make it self-aware." *Id.*  However, this fact is immaterial to the claim's recital of "a controller having … *potential* operational status conditions".  As Dr. Rhyne explained: "It's not so much having the conditions, the status conditions, as where did it determine what the states were of those conditions."  Appx6124.

for example, a controller keeping up with the state of the door position so that the controller will know which direction to move the door)].

Because the patent itself used the term "self-aware" as a short-hand for a requirement derived from the plain language of the claim itself—namely, that it is Claim 1's controller (not, for example, some external sensors) that has the potential operational status conditions required by the claim., The parties and the court adopted the same short hand language. *See, e.g.*, Appx7 ("Rhyne explained that the crux of his infringement analysis revolved around the concept of the GDO controller being self-aware, *i.e., that it did not rely upon any external sensors to obtain the* <u>*status conditions of the GDO*</u>.");[8] *see also* Appx9 (identifying "the '275's description of a self-aware controller [that is] *defined by a plurality of operating states*") (emphasis added).  Indeed, CGI's expert consistently tied his explanations to the plain claim language:

> Q. And Dr. Madisetti testified about this concept of self-aware. Do you have any response to his testimony on that?
>
> A. I think, your Honor, that the whole concept of self-aware, self-monitoring and all has gotten confused. I think the best thing to do is to just go back to the original claim language which is what I think led me to believe that the controller of Claim 1 of the '275 patent operated

---

[8] Indeed, TTI admits that the district court was really using the term "self-aware" to refer to the plain claim language's recital of transmitting information corresponding to a GDO controller's states, as opposed to merely transmitting information derived by external sensors.  *See* Opening at 32 ("The district court further erred *in defining "self-aware" to mean not reliant upon "external" sensors*") (emphasis added).

without having access to operational status conditions that are defined by external sensors.

And I base that on this language right here. It says, "A controller having." It doesn't say that it receives it from externally. It says it has it. And there's actually some language that supports my view. It's not like going further to construe it. …

Appx6518-6519 at 531:10-532:2.

The "self-aware" short-hand comes from the '275 specification's discussion of two embodiments: the first (like Claim 1) where a controller itself has the potential operational status conditions and the second, adding a limitation that the controller can also transmit a signal (like TTI's prior art) that it received from external sensors:

[T]he controller 11 can be self-aware of such operational status conditions (as when, for example, the controller 11 is aware that it has switched a given ambient light fixture on or off) or the controller 11 can be provided with externally developed information regarding the condition. To effect the latter, it may be desirable in some settings to use one or more status condition sensors 14.

'275 patent at 4:52-59; *see also id*. at 6:33-36 ("monitoring and detection can result through one or more operational status condition sensors and/or through the ability of the controller to self-monitor ***its own operational status***") (emphasis added).

CGI's expert discussed this section as further explanation of claim 1's plain claim language:

Q. So you're interpreting the word controller to mean self-aware controller; is that right?

A. Not just the word. The controller having pre-determined operational status conditions that the controller has them, ***in and of itself***. …

A. Well, I don't think that's a claim construction issue. ***It's what one of ordinary skill in the art would understand the language a controller having these status conditions to mean***, especially when read in light of the specification.

Appx6127 at 143:3-14 (emphasis added).

The Claim 1 approach, as explained by CGI's expert, requires that the controller has the potential operational status conditions that, e.g., keep track of door position. *See* Appx6126 at 142:4-19 (explaining that the Claim 1 controller "keeps up with the state of the door" so that, e.g., when a single-button wall console is pushed, the controller will know which direction to move the door). The Claim 1 approach improved the prior art external sensor approach by allowing for additional information and functionality built directly into the GDO. *See* Appx6054-6056 ('275 inventor discussing problems with prior art external sensors, and his improvement of providing state information from the controller, which allowed for "a lot more possibilities … [e.g.,] having other things know the status of the operator would allow those devices to be controlled in the garage, throughout the house"). The patent's use of dashed lines in Figure 1 to differentiate what is necessarily part of the invention and what is optional and added into some dependent claims further reinforces this concept. *See supra* at 8.

### 2.    TTI's attacks on the district court's claim construction discussion are misplaced.

TTI's remaining arguments are misplaced.  First, TTI argues that the district court erred by stating that "the only reasonable way to reconcile the difference between Claim 1 and Claim 2 is that Claim 1 eschews condition sensors in favor of a controller that does not rely on external sensors."  This is no error.

The district court did not find that "because Claim 2 has sensors (like Menard), Claim 1 cannot have sensors." Opening Br. at 25-26.  The district court merely acknowledged the differences in the claim language.  Claim 1 recites transmitting a signal defined by a controller's states.  Claims 2 and 3, on the other hand, add an additional signal transmission that corresponds to a separate component called a "condition status sensor."[9]  *See* '275 patent at claim 3 (reciting: "the wireless status condition data transmitter transmits data that corresponds to the at least one condition status sensor").

Indeed, the differences between the signal transmissions that are recited in claims 1 and 3 further support why claim 1's transmission of a signal corresponding to a controller's states should not be viewed as encompassing

---

[9] TTI incorrectly implies that CGI believed the Menard reference anticipates claim 2, but not claim 1.  Opening Br. at 27-28.  CGI has never asserted that position. Claims 2 and 3 add additional limitations to claim 1.  Menard's external sensors are similar to the status condition sensors recited in claims 2 and 3, but Menard doesn't disclose a controller having potential operational status conditions as required by each of these claims.

transmitting a signal relating to external sensor information.  If the patentee had

meant for the signal transmitted in claim 1 to include both types of information, or

either type of information, the more natural phraseology for claim 3 would be:

"wherein *the status condition signal [of claim 1]* comprises data that corresponds

to the at least one condition status sensor."  But claim 3 doesn't refer to "the status

condition signal" that is recited in claim 1.  Instead, claim 3 recites a separate

transmission, relating to a status condition sensor that has no antecedent basis in

claim 1—a transmission that is claimed as entirely separate from claim 1's

transmission of a "status condition signal."

Second, TTI's argument that the district court misinterpreted the prosecution

history is misplaced.  TTI's expert supported his external sensor "interpretation of

the [Claim 1] controller limitation" by arguing that the prosecution prior art was

not distinguished on the basis of having external sensors. Appx6361-6362 at

375:2-376:4.  CGI's expert responded by identifying that the '275 applicants did

indeed distinguish the prosecution prior art as including "a controller 18 that

receives a signal from various sensors … (which monitor such things a[s] carbon

monoxide, temperature, and a position of the garage door) and that sends that

signal to a voice synthesizer." Appx1187 at 11; Appx6412-6415 at 426:6-429:6].

The '275 applicants also amended the claims to recite an identifier and

distinguished Morris on this secondary basis.  However, there is no support for

TTI's argument that the "examiner believed" this amendment was the sole reason for allowance (Opening Br. at 29)—indeed, the prior iteration of the claims (before amendment) had recited a similar identifier. Appx1178 ("at least one, but not all, of the at least two operating states substantially uniquely identifies the movable barrier operator").

Third, TTI's argument with respect to Claim 5 is wrong. TTI argues that Dr. Rhyne agreed that "the only way to detect the likely proximal presence of a vehicle [as recited in claim 5] is to use a sensor." Opening Br. at 29. But upon re-direct, Dr. Rhyne recognized that there were ways to program a controller to recognize a vehicle. Appx6144-6145 at 160:23-161:3 ("if I drive up to my driveway and I push that button, I would think my controller could decide that there is a car coming as opposed to somebody who is walking down the driveway holding a button in their hand. They would know it's a HomeLink of the type that's only installed in cars"). CGI's proposed construction is the only construction that is consistent with the plain claim language. Indeed, other claims also recite the controller performing similar functions. *See, e.g.,* '275 patent at Claim 11 ("the first predetermined condition comprises at least one of ***the controller*** … detecting a likely proximal presence of a human"). Further, the district court rejected TTI's argument that Claim 5 is inoperable without external sensors after evaluating the expert testimony. *See* Appx8-9.

Fourth, TTI's lengthy discussion of this Court's *Luminara* Opinion—which did not involve any of the claim terms at issue here—is inapposite.

Fifth, TTI's proposed construction of "self-aware" (*see* Opening Br. at 32) is unwarranted. The term "self-aware" is not recited in the claims and does not require a construction. The district court did construe the claims to re-draft the plain claim language and insert the term "self-aware." Indeed, both sides proposed that the district court determine infringement and validity under the ordinary meaning of the claim language, only using the term "self-aware" as a short hand.

Further, neither party has asked the district court to incorporate the word "self-aware" into the claims in the current round of *Markman* briefing. *See* N.D. Illinois Case No. 1:16-cv-6097, Dkt. No. 151 (TTI's October 28, 2016 claim construction brief). Therefore, there is no need to construe the term "self-aware."

## B. TTI's Prior Art Does Not Invalidate The Asserted Claims

### 1. The district court's rejection of TTI's invalidity arguments is entitled to deference

The district court's validating findings are entitled to deference under the abuse of discretion standard. First, TTI argued that the claims were invalid because discrete claim elements were generally "well known". Appx9-10. These arguments, presented without identifying any explicit anticipation or obviousness theory, are improper. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (claims are "not proved obvious merely by demonstrating that each of its elements

was, independently, known"). Next, TTI argued the Menard external sensor approach in its preliminary injunction briefing, but only used a footnote to briefly mention that TTI was attaching an expert declaration that discussed a whole range of additional prior art theories. Appx14 at n. 8 (citing to the Tazumi reference). Finally, TTI presented a new invalidity argument *for the first time* during the preliminary injunction hearing, arguing that Menard and other prior art disclosed the external sensor approach *in addition to* a self-aware controller that would have a plurality of potential operational status conditions. Appx6371-6372 at 385:7-386:10; Appx6374-6375 at 388:25-389:8.

The district court addressed and dismissed each of these arguments. Appx9-10 (noting that TTI argues that "controllers, moveable barrier interfaces, and wireless transmitters were all well known in the art prior" … but "*none of the prior art*" identified by TTI taught the concept of the "self-aware" controller). The district court made its findings after reviewing a substantial amount of evidence, including multiple briefs that cited to expert declarations and deposition testimony, and including three days of witness testimony during the hearing. This finding is entitled to substantial deference. *Teva Pharm. USA, Inc. v. Sandoz, Inc*., 135 S. Ct. 831, 841 (2015) (the district court's factual findings with respect to anticipation and claim construction must be accepted unless they are clearly erroneous).

Indeed, deference to the district court's validity opinion and claim interpretation—which the court based in part on CGI's expert testimony—is particularly warranted in light of the stark differences between the experts' "expertise." *See Teva*, 135 S. Ct. at 841. CGI's expert worked "in or around the garage door industry for over 25 years" and has analyzed "more than 100 patents that in one way or another relate to garage doors openers and the related technologies" during this time frame. Appx6089-6090 at 105:20-106:16. In contrast, TTI's expert had never examined a garage door opener and was unable to understand the '275 patent's explicit discussion of the "self-aware processor" vs. the external condition sensor approach. *See* Appx2977 at 169:3-13 ("Q: What does it mean by, The controller can be self-aware or it can be provided with externally developed information? A. I mean, again, I'm not sure what that means. . . . "); Appx2989 at 215:16-22 ("Q. Can you identify for me in any of the prior art that you identify with respect to the '275 Patent where information that a controller would be self-aware of is transmitted? A. Self-aware? Q. Correct. A. I have no idea what you mean."); Appx2973 at 151:21-23 ("Q. Have you ever taken apart or examined any garage door opener? A. No.")).[10]

---

[10] TTI's expert was also unable to understand claim 3 concept of using a condition status sensor. *See* Appx2989-2990 at 217:16-219:7 ("Q. Claim 3 says that this transmitter can also transmit data that corresponds to at least one condition status sensor; correct? A. I mean, that's what Claim -- Claim 3 seems to say . . . Q. What

The district court carefully weighed the testimony and found that CGI's expert's testimony was "convincing." Appx9.

## 2. This district court's rejection of TTI's prior art theories was not an abuse of discretion

TTI continues its shotgun style approach to invalidity arguments here— making several arguments as to why the Menard and/or Tazumi reference invalidate the asserted claims. TTI even makes new arguments that were never raised in the district court below and which are inappropriate to bring up for the first time at the appeal stage. *See, e.g.*, Opening Br. at 37 (arguing that the "use of a 'self-aware' controller with Menard is obvious"). TTI has failed to show an abuse of discretion with respect TTI's multi-headed approach and this Court can affirm the preliminary injunction on this basis alone.

### (a) The Menard reference does not anticipate the asserted claims.

The district court correctly found that the Menard reference (and all of the prior art identified by TTI) relied solely upon external sensors and therefore did not invalidate the asserted claims. *See* Appx10 ("Dr. Rhyne was able to show that in

---

is a "condition status sensor" as discussed in claim 3? [A.] I mean, I'm not sure. . . . it refers to a condition status sensor in Claim 2 where there's a "further comprises." So it's some sort of additional feature -- Q. Like an additional external sensor? A. You know, I don't know. It talks about some sort of condition status sensor. . . . Q. After reviewing the patent, the file wrapper, and being an expert in this field, you don't have any idea what Claim 3 is referring to . . . A. I don't know what it means. It talks about a condition status sensor.").

each reference, unlike with the '275 patent, the controller relied upon external

sensors in order to receive the information to be transmitted wirelessly.").

The district court considered substantial evidence showing Menard's sole

reliance upon external sensors:

- *See, e.g.,* Appx6524 at 537:5-9 (CGI's expert describing the Menard

process: "'[S]ensor 155 provides the position information to processor 120.' It

comes in from an outside sensor. And then it says the user receives notification at

370. So it's an in and out").

- *See, e.g.*, Appx6522 at 535:22-24 (Menard's disclosure of using

external devices such as "magnetic switches, contact switches, optical devices, or

cameras" to determine door position).

- *See, e.g*., Appx6522 at 535:13-17 (CGI's expert describing Menard's

position sensor: "you can see, your Honor, that it is a separate position sensor

external to processor 120")

Despite the overwhelming evidence, TTI continues to identify Menard's

disclosure of sensors to this Court:

- *See* Opening Br. at 22, citing to Appx1170, ¶ 25 (which discloses a

"garage door position sensor" and an "optical sensor");

- *See* Opening Br. at 22, citing to Appx1171, ¶ 30 (which discloses a

"[p]osition sensor 155"); and

- *See* Opening Br. at 22, citing to Appx1173, ¶ 61 (which discloses "information derived from a door position sensor").

Indeed, the claim chart that TTI provided in its opening brief (*see* Opening Br. at 22) is illustrative of why the Menard external sensor approach does not anticipate claim 1. Specifically, TTI argues the following with respect to the "a controller having …potential operational status conditions" language: "The [Menard] processor may '***receiv[e] a predetermined signal*** …." Opening Br. at 22 (emphasis added). TTI does not explain how receiving a predetermined (actual) signal is the same as a controller "having … potential" (not actual) conditions. The lack of explanation is obvious—they are not the same.

The different approaches taken by the '275 patent and the Menard patent with respect to determining a light status further illustrate why Menard does not invalidate the asserted claims. CGI's expert distinguished Menard by explaining that Claim 1's "controller having … potential operational status conditions" discerns the status of the system based on the controller's own actions or knowledge of its states:

> The key here is that the controller can think it's turned the light on. Its programming says, send a signal out to the light to turn it on. If it's self-aware, it doesn't have any way to know absolutely for sure that the light actually came on. It could be burned off or the bulb could have been unscrewed or some failure. That would be only accomplished if you had a separate sensor located next to the light that could detect that it lit up and sent a signal back to the controller.

Appx6094 at 110:14-22; *see also* '275 patent at 4:54-55 ("the controller 11 is aware that it has switched a given ambient light fixture on or off"). Menard, by contrast, disclosed an external photocell sensor that detects light and "provide[s] a signal to indicate if an interior or exterior garage light is illuminated." Appx1173 at ¶ [0054]; Appx6414 at 428:6-20.

Further, the district court was presented with additional reasons as to why the Menard reference does not invalidate the claims.[11]  Appx6558 - 6559 at 571:2-572:2, Appx3093 - 3094 at 8-9, Appx3175 - 3179 at ¶¶ 119-29.  For example, Menard does not describe the message format or provide *any other* information showing disclosure of the claimed "a present operational status condition *defined*, at least in part, *by at least two operating sates from the plurality of operating states*." '275 patent claim 1.  TTI merely cites to high level disclosure of transmitting information generally, without identifying any signal that meets the claim element.  *See, e.g.,* Opening Br. at 22 ("[p]osition information is transmitted … [o]ther information, such as temperature or light levels, may also be transmitted").  There is no disclosure of whether the signal is defined by at least

---

[11] The Court may affirm the district court on any ground that has a basis in the record, regardless of whether the district court addressed that specific issue in its opinion. *See Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 (7th Cir. 2001) ("An appellate court may affirm on any ground that has a basis in the record. . . . Thus, even though the district court, in denying the preliminary injunction, did not address the irreparable injury prong of the preliminary injunction calculus, we may affirm the judgment on the alternative ground.")

two operating states. *Compare* Appx6439 at 452:17-21 (TTI expert arguing that some types of signals, e.g., sending information about a single door position, do not meet claim 1); Appx6440-6441 (TTI expert arguing that sending two operating states to a receiver, which then creates the information does not meet claim 1); Appx3089 (CGI expert's identification of how the message format for the Ryobi GD200 is defined by at least two operating states and meets the claim requirement).

As another example, TTI's identification of a Bluetooth device address in Menard as the claimed "identifier that is at least relatively unique to the moveable barrier operator" is flawed. *See* Opening Br. at 22. Menard discloses that the Bluetooth transmitter can be coupled to multiple garage door openers. [Cite Appx1174 at [0071]. When faced with this fact at deposition, TTI's expert withdrew his Bluetooth opinion and stated that the identifier must be there somewhere. Appx3094 at 9. CGI's expert identified the flaws in this inherency opinion. Appx3178-3179 at ¶¶ 128-129 (citing to Appx3000 at 259:14-19) (identifying Menard's ability to distinguish between multiple doors does not mean that the claimed status condition includes an identifier—Menard discloses multiple communication standards that could separately transmit door identifiers).

In the end, the district court was presented with the many flaws in TTI's Menard anticipation theory and after considering the substantial evidence found

that TTI had not shown a substantial question of invalidity. The district court identified the primary error with TTI's theories in the preliminary injunction order (*see* Appx10 (the prior art all relied solely upon external sensors for the transmission)) and was not required to identify each and every missing limitation with Menard.

### (b)    The Menard reference does not disclose a "self-aware controller."

As a threshold issue, this Court should find that TTI's current arguments that the Menard reference discloses a self-aware controller that would "have … potential operating status conditions" as recited in claim are waived. *See* Opening Br. at 33-36. TTI's current arguments regarding this theory, with the small exception of the discussion of "settings and configuration information" (Opening Br. at 36), are entirely new and were never presented to the district court. It would be improper for this Court to consider these new arguments for the first time upon appeal. *See Caterpillar Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1368 (Fed Cir. 2004) (generally "an appellate court does not consider arguments first made on appeal").

With regard to TTI's "setting and configurations" argument (Opening Br. at 36), CGI's expert testified that these settings are not the claimed controller states—because states are something that varies from time to time, while settings are something that you program into a system upon installation. *See* Appx6564-6565

at 577:9-578:8; *see also* Appx6424-6525 at 537:10-538:23 (identifying how TTI's new argument regarding a self-aware Bluetooth transmitter are also misplaced).

TTI's new "self-aware" controller argument fails to show any "controller having … potential operational states" and transmitting a status condition signal, as claimed, for at least the following reasons:

- TTI's arguments regarding Menard's claim 27 and Menard's ¶ 69 disclosure present a flawed inherency theory. *See* Opening Br. at 33. These disclosures do not at all disclose "a controller having … potential operational status conditions." And TTI has not shown that these passages necessarily disclose the claimed invention, particularly given the substantial disclosure in Menard regarding the external sensor approach (*see supra* at 38). *See Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 641 (Fed. Cir. 2011) ("'Inherency can be established when prior art necessarily functions in accordance with, or includes the claimed limitations.' 'Inherency, however, may not be established by probabilities or possibilities.'") (citation omitted).

- TTI's arguments regarding Menard's alleged internally developed "(1) door position and (2) power status states" also presented flawed inherency theories and mischaracterize the testimony by CGI's expert. Dr. Rhyne never testified that Menard's door position is determined by a self-aware controller, nor did he testify that ***all*** GDOs that use a wall-controller include a self-aware

controller. Instead, he identified how the door position in Menard is determined by external sensors. Appx6523-6524 at 536:16-537:9. Further, there is no disclosure in Menard as to whether the "button on switch 65" (*see* Opening Br. at 34) sends a control signal to open or close the door as compared to using a "controller having … potential operational status conditions" that keeps up with the state of the door as claimed. Similarly, the fact that "Menard does not suggest that external sensors play any role in determining whether line power has been restored" does not prove that external sensors were not used. *See* Opening Br. at 36. Again, the substantial disclosure in Menard regarding the external sensor approach (*see supra* at 38) substantially undermine TTI's inherency theory.

- TTI's theory that a "wireless application protocol server" may allow users to program the system are misplaced. At best, this argument relates to an outside device transmitting information to the alleged moveable barrier operator— it says nothing about whether the moveable barrier operator includes "a controller having … potential operational status conditions," or whether the moveable barrier operators will transmit a status condition signal that corresponds to those conditions, as claimed.

### (c) The Menard reference in combination with a "self-aware" controller" does not render the asserted claims obvious.

TTI's argument that the "use of a 'self-aware' controller with Menard is obvious" (*see* Opening Br. at 37, vaguely citing to a 1973 book that Dr. Rhyne

testified about) was never raised with the district court.  It would be improper for this Court to decide this argument for the first time.  *See Caterpillar Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1368 (Fed Cir. 2004) (generally "an appellate court does not consider arguments first made on appeal").

Nor is this argument supportable.  As stated by the Supreme Court:

> As is clear from [precedent], a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. … This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.

*KSR*, 550 U.S. at 418. This holding is particularly true here where TTI failed to identify any specific prior art that allegedly discloses the claimed features and failed to identify any reason prompting a person of skill to combine prior art the features.  *See id.* ("it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does").[12]

---

[12] TTI's additional argument that the district court failed to make any specific obviousness rulings (*See* Opening Br. at 37) is misplaced.  The district court addressed TTI's shot-gun approach of arguing that "controllers, moveable barrier interfaces, and wireless transmitters were all well known in the art prior", but ultimately found that CGI "was able to show that in each reference, unlike with the '275 patent, the controller relied upon external sensors in order to receive the information to be transmitted wirelessly."  Opinion at 9-10.  If there was any error in the district court not addressing obviousness more fully, the error stemmed from

**(d)    The Tazumi reference does not render the asserted claims obvious.**

The district court properly addressed and rejected TTI's arguments with respect to the Tazumi reference. *See* Appx10 ("Dr. Madisetti relied on Menard, Tazuna[13] and several other patents" each of which "relied upon external sensors"). Further, TTI did not present a cognizable invalidity theory with respect to the Tazumi reference—TTI's brief only briefly mentioned (in a footnote) that it is attaching an expert declaration that discusses the Tazumi reference. Appx2191 n. 8. And TTI's theory about a self-aware controller in Tazumi, was only mentioned for the first time during the preliminary injunction hearing in a cursory manner. *See* Appx6374-6375 at 388:25-389:4. TTI has not raised a substantial question of invalidity.

Further, the district court considered substantial evidence showing Tazumi's reliance upon external sensors. For example, CGI's expert identified that:

> Tazumi does not disclose Element 1[a]: "*a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states.*" As I explained above, ***this element – which recites that the "operational status conditions" are conditions of the "controller"*** – claims the self-aware controller described in the specification of the '275 Patent. Because Tazumi's controller is not

---

TTI's inability to present a cognizable obviousness defense that identified specific references and reasons for combing the references.

[13] The opinion includes a typographical error: "Tazuna" refers to the Tazumi reference.

> self-aware, and must rely on external sensors, Tazumi does not disclose Element 1[a] of the '275 Patent.

*See,* Appx3180 at ¶ 133 (emphasis added). CGI's expert then discussed how TTI only identified functionality in Tazumi that related to external sensors. *See* Appx3180 at ¶ 134 (identifying that "door position information" and temperature are derived from external sensors); Appx3179 at ¶ 131 (identifying Tazumi's reliance on object sensors, optical sensors, and a sensor assembly"). With respect to TTI's argument regarding Tazumi resetting its CPU—Dr. Rhyne testified that there is no disclosure in Tazumi that this capability is performed by the claimed "controller having … potential operational status conditions." *See, e.g.,* Appx6569-6570 at 582:4-583:10. Further, like with the Menard reference, TTI has not shown any disclosure in Tazumi of sending a status condition signal that corresponds to an operational status condition that is defined by at least two operating states as claimed. *See supra* at 38.

The district court's opinions are based on a thorough consideration of the evidence after weighing the credibility of the experts and is entitled to substantial deference. This Court should affirm the district court's findings in which TTI's invalidity theories were specifically rejected.

### (e) Secondary considerations also support a finding of non-obviousness.

The district court also heard evidence regarding secondary considerations, which is an alternative basis upon which this Court can affirm the preliminary injunction. *See Anderson*, 274 F.3d at 478, *supra* n. 11. Dr. Rhyne explained that CGI's HD950WF garage door opener practice claims 1 and 5 of the '275 patent using CGI's commercially successful MyQ® system. Appx1675-1681 at ¶¶ 57-71; Appx3184-3185 at ¶¶ 151-53. Dr. Rhyne also explained that there was a nexus because the primary use of the MyQ® system is to send status condition information from a GDO. Appx3184-3185 at ¶ 153. Jim Fitzgibbon, the inventor of the '275 patent, likewise testified that the '275 patent was "pivotal" to the MyQ® technology. Appx6069 85:17-20; *see also* Appx6070 at 86:4-22. Additionally, John Fitzgerald testified that the MyQ® system, and specifically the ability for a garage door opener to send status information, had been praised by the industry. Appx6157-6158 at 173:4-174:10; Appx1486 at ¶ 8; Appx1598. Thus, there is ample evidence in the record supporting that the '275 patent's invention has been commercially successful for CGI and praised by the industry, which is an alternative basis upon which this Court should affirm the grant of a preliminary injunction.

CONFIDENTIAL INFORMATION REMOVED FROM THIS PAGE

## II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT CHAMBERLAIN WAS LIKELY TO SUFFER IRREPARABLE HARM

### A.    The District Court Properly Found that Chamberlain's Irreparable Harm Stems from TTI's Infringement

The district court held that the recent launch of the Ryobi GDO was "directly connected" to the lost market share, lost accessories, and price erosion that Chamberlain stood a substantial risk of suffering if a preliminary injunction was not entered. Appx16.

A virtual tsunami of evidence connected the '275 patent technology with TTI's customers' desire for a connected GDO.  As the trial court heard, Mr. Farrah, the president of the Power Tools Group at One World Technologies, Inc., agreed, stating there was a "████████" from Home Depot, that the Ryobi GDO include connectivity. Appx2834-2835 at 145:4-146:6. As Mr. Farrah explained, it was one of two features that Home Depot insisted must "be ███ of the ██████ to ██████ it on the ███." Appx2835 at 146:7-11.  The court also heard that there is very little utility in connecting to and controlling a GDO—for example, from a smartphone—without also being able to monitor the status of the GDO operator—a status provided by the inventions of the '275 patent.  Appx6208 at 224:8-18 (testimony of Cory Sorice, CGI's Vice President of Marketing, Connected Products and eCommerce); Appx6055-6057 at 71:24-73:1, Appx6057-6058 at

CONFIDENTIAL INFORMATION REMOVED FROM THIS PAGE

73:15-74:1 (Jim Fitzgibbon) Customers feel safe and secure knowing their garage door is closed, or in receiving an alert that the door has opened—not in pushing the close button without feedback.  Appx6208 at 224:8-18; Appx6221-6222 at 236:24-237:17 ("If someone had forgotten and left their garage door open, they can use the smartphone app to close it and also get feedback that it had been closed with confidence."); Appx6226 at241:10-13 ("We highlight on this the smart garage and its core attributes back to Chamberlain around security and peace of mind or always knowing that your home is secure." (discussing Appx3417-3418) (Mr. Sorice); Appx6273-6274 at 288:3-289:1 ("It says MyQ®'s features to remotely close and open are great. Well, you can only remotely close and open if you know what the state is, right. And that's what the next sentence relates to. I can tell if the door has been open for long and if someone has entered") (discussing Appx4379); PI Hearing Tr. 289:11-12 ("[E]very major retailer placed a wifi GDO at a new, higher price point") (discussing Appx4293-4294) (testimony of Christopher Bakewell, CGI's economics expert)).  And the safety and security that comes with this ability to monitor your garage door is, as Mr. Farrah explained, a "▮▮▮▮▮ ▮▮▮▮▮ that helps ▮▮."  Appx2855 at 227:18-22; Appx6270-6271 at 285:19-286:15; *cf. Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 642 (Fed. Cir. 2015) (causal nexus can be satisfied with a showing that "there is 'some connection' between the patented features and the demand" for the infringing product or that

"the patented features impact consumers' decisions to purchase the accused

devices").

### B.    The District Court Did Not Abuse Its Discretion in Finding Chamberlain Likely to Be Irreparably Harmed by Lost Market Share Due to TTI's Infringement

The district court did not abuse its discretion by finding that the infringing

features of the Ryobi GDO would likely cause Chamberlain to lose market share,

and therefore suffer irreparable harm.    To obtain a preliminary injunction, the

movant must only "demonstrate that irreparable injury is *likely* in the absence of an

injunction," not that it is certain. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

22 (2008).  Furthermore, lost market share can support a finding of irreparable harm.

*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975–76 (Fed. Cir. 1996); *Trebro*

*Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1170 (Fed. Cir. 2014) (collecting

cases).  And the evidence of lost market share does not need to be perfect. *See Robert*

*Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1154 (Fed. Cir. 2011) ("While the

party seeking an injunction bears the burden of showing lost market share, this

showing need not be made with direct evidence.").

Here, the district court found it was likely—not merely possible—that

Chamberlain would lose market share to TTI:

> ***Assuming that the Ryobi introduction at Home Depot is successful***
> (there is some circumstantial evidence that it is successful, such as
> preferential product location and advertising in Home Depot), ***there has***
> ***to be some loss of market share on CGI's part***. Since the product is

CONFIDENTIAL INFORMATION REMOVED FROM THIS PAGE

relatively inelastic, *a sale of a Ryobi GDO most likely comes at the expense of one of the other brands*. Since Chamberlain has almost █ times the market share of Genie, one would expect that for every █ Ryobi GDOs sold by Home Depot █ would be lost by CGI and █ by Genie.

Appx16 (emphasis added).  The district court made a number of supporting findings. TTI entered the GDO market in May 2016, when it launched the Ryobi GDO. Appx15. Pre-launch, Chamberlain was the major player in the GDO industry, with approximately █ of the market share. Appx15. The Ryobi GDO is in direct competition with Chamberlain's GDOs, with both targeting customers desiring "connected" GDOs that can transmit GDO statuses. Appx15. In fact, the record shows that Chamberlain and TTI were the only higher-end, out-of-the box "connected" GDOs sold in Home Depot retail stores. Appx3099; Appx6498-6499 at511:13-512:23; Appx3360 at ¶6. Finally, the GDO market is inelastic, typically limited to consumers replacing a broken garage door opener or to new home construction. Appx15; Appx6203 at 219:10-20; Appx6295-6296 at 310:23-311:8. As a result, the entry of the Ryobi GDO is unlikely to create significant new demand for GDOs. *See, e.g.* Appx6203 at 219:19-20 ("There are few people who replace a garage door opener ahead of need.").

This alone was enough for the district court to find a likelihood of lost market share that could not easily be recovered. *Bosch*, 659 F.3d at 1151 ("the existence of a two-player market may well serve as a substantial ground for granting an

injunction—e.g., because it creates an inference that an infringing sale amounts to a lost sale for the patentee"); *see also Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). Infringing sales by a direct competitor in an inelastic, two-player market presumptively reduce the second party's market share, which is a form of irreparable harm.

Despite the presumptive market loss, the court's finding of irreparable lost market share did not rest on this presumption. The court noted that there was evidence that the Ryobi GDO was successful, including preferential product location and advertising in Home Depot, such as the addition of the Ryobi GDO to a "connected home" aisle end-cap suggested by Chamberlain. Appx16; Appx6235-6239 at 250:23-254:6; Appx3368 at ¶ 31; *see also* Appx6502-6503 (Mr. Farrah testified at his deposition that sales "exceed[ed] expectations"). These findings support the conclusion that Chamberlain not only *likely* lost market share, but *actually* lost market share to the infringing Ryobi GDOs.

The court also found that there had been a "marked reduction" in Chamberlain's sales immediately after the launch of the Ryobi GDO. Appx15; *see Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) (holding that the district court abused its discretion when it found no irreparable harm where parties were direct competitors and the infringing product caused the patentee to lose sales). The court's findings of lost market share are not

based on speculation, but on factual findings that align with basic economic principles and legal precedent. *Cf. Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991). The court here did not abuse its discretion.

To rebut the district court's finding of likely lost market share, TTI proffers evidence that Chamberlain's sales have risen since the launch of the Ryobi product. But this rise in sales was only after the retail price of the Chamberlain products was significantly reduced. Appx15. Moreover, even with the increase in sales driven by this drop in price, sales of Chamberlain's higher-priced, connected garage door openers at Home Depot still fell below comparable 2015 sales. Appx3101-3103; Appx3114-3115 at ¶¶ 6-7 & Appx3137-3140 Year-over-year sales trends are more relevant here than week-by-week, because they better account for natural seasonal changes in demand. Appx6283 at 298:16-21; Appx3363 at ¶ 16; Appx3981-3982 at ¶¶ 104-05. Such a drop is indicative of lost market share, particularly in light of the undisputed trend upward of sales of Home Depot driven by falling sales at Sears. Appx3102

## C. The District Court Did Not Abuse Its Discretion in Finding Chamberlain Likely to Be Irreparably Harmed by Lost Accessory Sales

Based on the district court's finding of lost sales due to the Ryobi GDO, the district court also found that Chamberlain would suffer irreparable harm from lost accessory sales. Such sales are a substantial part of CGI's business, accounting for

CONFIDENTIAL INFORMATION REMOVED FROM THIS PAGE

approximately █████ of Chamberlain's gross profit. Appx16; *see also* Appx4315. Lost accessory sales can be difficult to quantify, and therefore are a form of irreparable harm. *See Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 645 (Fed. Cir. 2015). Moreover, as Mr. Farrah admitted, companies use accessory sales to build brand loyalty. *See* Appx3992-3993 at ¶¶ 124-27; Appx2814 at 65.  The loss of this ability to cement brand loyalty and product loyalty is irreparable.

### D. The District Court Did Not Abuse Its Discretion in Finding Chamberlain Likely to Be Irreparably Harmed by Price Erosion Due to TTI's Infringement

Nor did the district court abuse its discretion by finding price erosion. After several weeks of lower sales following the Ryobi GDO launch, Home Depot dropped the price on Chamberlain's HD950WF "connected" garage door opener by $40, from $268, the suggested retail price, to $228. Appx3-4, Appx15; *see also* Appx3364 at ¶ 21 & Appx3578. In late August, Home Depot raised the price to $244, slightly less than retail price of the Ryobi GDO. Appx6150 at 166:4-6 (Fitzgerald); Appx3364 at ¶ 21 & Appx3585-3586. Given the timing of the drop in price and ultimate placement of the HD950WF only $4 below the price of the Ryobi GDO, it was not abuse of discretion for the district court to find that this price erosion is "directly connected" to the entry of the Ryobi GDO.  Appx16.

TTI argues that Chamberlain has not been harmed by this price drop because the wholesale price has not changed. This argument misses the point for multiple

reasons. First, as the record shows, Home Depot has already sought contribution from Chamberlain to cover the price reduction, and substantial evidence supports the district court's common-sense conclusion that it will continue to pass the pricing pressure back to Chamberlain. Appx6150-6151 at 166:11-167:18. The particular amount is not yet known, and need not be known, because some decrease will no doubt fall on Chamberlain.

Second, TTI misunderstands the nature of the harm caused by price erosion. A retail price reduction harms the manufacturer in ways that are not easily quantifiable. Indeed, that is why this Court has frequently found price erosion a basis for preliminary relief. *See, e.g.*, *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012); *Bosch*, 659 F.3d at 1155. Once prices are lowered, customers will seldom happily return to the higher price, resulting in lost goodwill and potentially lost sales. *See Polymer Techs.*, 103 F.3d at 975–76 ("Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option."). Moreover, eroded prices have a monetary impact greater than the reduced price of the affected product. That is particularly true here. The HD950WF is Chamberlain's highest priced product at Home Depot. As a result, the post-launch reduced price has an umbrella effect, essentially capping the price of all Chamberlain products at Home Depot and potentially other retailers as well. Appx6275-6276 at 290:24-291:3 ("The price point at the very highest level, the high

price point, HPP, lifts up the prices across all of the segments, and it creates interest

across all those segments.") (Bakewell); Appx3363-3365 at ¶¶ 18, 22-23. The court

did not abuse its discretion in finding irreparable harm by price erosion.

### E.    Other Forms of Price Erosion, Including Harm to Customer Goodwill and Business Relationship, Also Support a Finding of Irreparable Harm

The district court also heard evidence regarding other types of irreparable

harm, including harm to customer goodwill and harm to CGI's relationship with

customers, installers, and Home Depot, which provide alternative bases upon which

this Court can affirm the preliminary injunction. *See Anderson*, 274 F.3d at 478; *see*

*supra* at n. 11.  For example, in its advertising, TTI touts the Ryobi GD200's

"unprecedented innovation," implying CGI's garage door openers are not

innovative.  Appx3366 ¶ 26 & Appx3882-3897. With this advertising, TTI takes aim

at CGI's reputation for innovation, which has been a core part of CGI's marketing

philosophy and that CGI has invested significant resources and effort to develop and

maintain, including by filing patents on its many innovations.  Appx3366 ¶ 26; First

Appx1485-1486 ¶¶ 3-7.  Furthermore, CGI's lost market share will result in a

lessened "network effect" from customer recommendations, leading to lost customer

goodwill that is impossible to calculate.  Appx3992-3994, Appx4000-4006.

Additionally, because Ryobi is an exclusive supplier to Home Depot, Home

Depot has incentive to promote Ryobi over comparable CGI products. Home Depot

is now featuring the Ryobi GDO in its advertisements, where previously it featured CGI's products more prominently.  Appx3986 at ¶¶ 113-114; Appx1489 at ¶ 18; Appx3368 at ¶ 31. Indeed, there was testimony at trial about one advertisement opportunity lost to TTI.  Appx6237-6239. That CGI must now directly compete against such an ally of Home Depot harms the CGI-Home Depot relationship.  This further evidence of irreparable harm offers an alternative basis upon which the Court may affirm the grant of a PI.

### III.    THE PRELIMINARY INJUNCTION RESTS SOLELY ON THE '275 PATENT, NOT THE '966 PATENT

TTI is correct—the preliminary injunction—and this appeal—are based solely on the '275 patent.  This court has universally guarded its own jurisdiction, recognizing that it is a court of review, and not a court of first impression.  There is no final judgment here, nor is the district court's decision to deny a preliminary injunction on the '966 patent on appeal.  Asking this Court to issue dicta on a preliminary matter not on appeal contravenes the statutory limits on this Court's jurisdiction, as well as the Court's long-standing and universal application of these statutory limits.  TTI's request is wholly inappropriate.

### CONCLUSION

For all the reasons set forth above, Chamberlain respectfully requests that this Court affirm the district court's grant of a preliminary injunction.

Dated: November 15, 2016                Respectfully submitted,

/s/ *Michael R. Rueckheim*

Michael R. Rueckheim
FISH & RICHARDSON P.C.
1221 McKinney Street, Suite 2800
Houston, TX 77010
E-mail: Rueckheim@fr.com
Tel.: 713-654-5300
Fax: 713-652-0109

*Counsel for Plaintiff-Appellee The*
*Chamberlain Group, Inc.*

## CERTIFICATE OF SERVICE

I certify that on November 15, 2016, I electronically filed the foregoing

using the Court's CM/ECF filing system. Counsel for appellants were

electronically served by and through the Court's CM/ECF filing system per Fed.

R. App. P. 25 and Fed. Cir. R. 25(a) and 25(b).


*/s/ Michael R. Rueckheim*
Michael Rueckheim

## CERTIFICATE OF COMPLIANCE

The Responsive Brief for Plaintiff-Appellee complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). The relevant portions of Appellee's Responsive Brief, including all footnotes, contain 13,283 words, as determined by Microsoft Word® 2013.

<u>/s/ *Michael R. Rueckheim*</u>

Michael R. Rueckheim
FISH & RICHARDSON P.C.
1221 McKinney Street, Suite 2800
Houston, TX 77010
E-mail: Rueckheim@fr.com
Tel.: 713-654-5300
Fax: 713-652-0109

*Counsel for Plaintiff-Appellee The Chamberlain Group, Inc.*